# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| **MICHELLE H.**, by her next friend Tamara Coppinger, **AVA R.**, by her next friend Tamara Coppinger, **ZAHARA L.**, by her next friend Deborah Wilson, **SAMMY V.**, by his next friend Aleksandra Chauhan, **ANDREW R.**, by his next friend Cheryl Kreider, **MARCUS, ANNIE, CAMERON, SARA, and ROGER B.**, by their next friend Margaret Wilson, and **KYLE S.**, by his next friend Tamara Coppinger,<br><br>**individually and on behalf of all other similarly situated children.**<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**NIKKI HALEY**, in her official capacity as<br>  Governor of the State of South Carolina,<br><br>**SUSAN ALFORD**, in her official capacity as<br>  Acting State Director of the South Carolina<br>  Department of Social Services.<br><br>    **Defendants.**<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  **C/A No.** 2:15-cv-134-RMG<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' ORIGINAL COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AS A CLASS ACTION

TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ........................................................................... 6

III.    PARTIES .............................................................................................................. 6

        A.      PLAINTIFFS .......................................................................................... 6

                Named Plaintiffs, Collectively ................................................................ 6

                Michelle H. .............................................................................................. 6

                Ava R. .................................................................................................... 10

                Zahara L. ................................................................................................ 14

                Sammy V. ............................................................................................... 18

                Andrew R. .............................................................................................. 21

                Marcus B., Annie B., Cameron B., Sara B., and Roger B. .................. 24

                Kyle S. .................................................................................................... 26

        B.      DEFENDANTS ..................................................................................... 29

IV.     CLASS ACTION ALLEGATIONS .................................................................. 30

V.      FAILURES IN THE SOUTH CAROLINA FOSTER CARE SYSTEM
        HAVE BEEN WELL-KNOWN BUT UNADDRESSED FOR ALMOST
        THREE DECADES ............................................................................................. 35

VI.     SPECIFIC FAILURES IN DEFENDANTS' OPERATION OF THE
        SOUTH CAROLINA FOSTER CARE SYSTEM ............................................ 39

        A.      DEFENDANTS' DANGEROUS PLACEMENT PRACTICES
                STEMMING FROM AN EXTREME SHORTAGE OF FOSTER
                HOMES AND OTHER APPROPRIATE PLACEMENTS
                VIOLATE THE LAW ........................................................................... 39

1.    Defendants Maintain A Dangerous Shortage Of
      Safe And Appropriate Foster Homes And Other
      Living Situations For Children in Foster Care ............................. 39

2.    Defendants Unnecessarily Institutionalize Children
      in Foster Care, Especially Young Children, For
      Extended Periods Of Time ............................................................. 41

3.    Defendants Deny Community-Based Placements
      and Necessary Treatment Services For Children in
      Foster Care Who Have Emotional, Behavioral, or
      Mental Health Disabilities ............................................................ 44

4.    Defendants Repeatedly Move Children From One
      Inappropriate Foster Home Or Facility To Another .................... 47

5.    Defendants' Known Placement Practices
      Significantly Interfere With Critical Family Ties
      For Children In Foster Care ........................................................... 49

6.    Defendants' Placement Shortage Causes Children in
      Foster Care to be Housed Unnecessarily in Juvenile
      Justice Facilities ............................................................................. 53

B.    DEFENDANTS' EXCESSIVE CASELOADS AND SAFETY
      MONITORING FAILURES VIOLATE THE LAW ............................................ 54

C.    DEFENDANTS VIOLATE THE LAW BY FAILING TO
      PROVIDE CHILDREN IN FOSTER CARE WITH REQUIRED
      MEDICAL, DENTAL AND MENTAL HEALTH
      ASSESSMENTS, SCREENINGS AND TREATMENT .................................... 60

VII.    CAUSES OF ACTION ................................................................................................. 64

VIII.   PRAYER FOR RELIEF ............................................................................................... 71

## I.    INTRODUCTION

1.     This civil rights class action seeks injunctive relief compelling the Honorable Nikki Haley, Governor of the State of South Carolina ("Governor Haley"), and Susan Alford, Acting State Director of the South Carolina Department of Social Services ("Director Alford"), in their official capacities (collectively, the "Defendants"), to remedy specific deficiencies in the South Carolina Department of Social Services ("DSS") in order to safeguard and prevent harm to foster children in DSS custody.

2.     Governor Haley and Director Alford directly and indirectly control the actions, inactions, policies, patterns, customs and practices of DSS alleged in this Complaint.

3.     This civil rights class action is brought pursuant to 42 U.S.C. § 1983 on behalf of a Class and Subclasses of children who are or will be in the legal custody of DSS in foster care ("Plaintiff Children").

4.     Plaintiff Children seek only systemic declarative and injunctive relief to stop DSS from continuing to violate the federal constitutional and statutory rights of the putative Class and Subclasses.

5.     Plaintiffs are children who are removed from their homes due to extreme family circumstances and placed in the legal custody of DSS at the direction and control of DSS.  As wards of the State, Plaintiff Children are wholly dependent on the State, and in particular on DSS, for their safety, well-being and required services.

6.     As a direct result of longstanding, well-documented failures by DSS, Plaintiff Children have been and continue to be harmed physically, psychologically and emotionally and continue to be placed at ongoing risk of such harms while in DSS custody.  DSS is re-victimizing the very children it is charged to protect.

1

7.      DSS has long operated, and continues to operate, a system in which Plaintiff Children are the victims, or remain at risk of becoming victims, of three specific unaddressed deficiencies:

- ***A drastic shortage of foster homes.*** DSS fails to maintain an adequate number and kind of foster homes and other appropriate living situations for children. According to the June 2014 DSS Child and Family Services Plan for FFY 2015-2019 (the "2014 DSS Plan"), DSS "did not regularly put the child in placement settings appropriate for the child – examples include[] group home settings and shelters." A 2008 report of the Governor's Task Force on Children in Foster Care and Adoption Services (the "2008 Governor's Task Force") found that DSS's "insufficient number of foster homes" leads to "the inability to match children's needs to available foster homes."

- ***Excessive caseworker caseloads and an unstable foster care workforce that cannot provide basic monitoring of children's safety.*** The caseloads of foster care caseworkers and child protective services investigators frequently exceed two times and often three or four times national standards and DSS's own policy standards. As found by the South Carolina General Assembly Legislative Audit Council in its October 2014 report (the "2014 LAC Report"), DSS child welfare caseloads are "excessive, reducing the amount of attention that can be given to each child" and "reducing the ability of caseworkers to investigate and prevent child abuse and neglect." These high caseloads (many as high as 50, 60 or even 75 children per worker), combined with persistent high turnover, result in an unstable workforce that does not and cannot provide basic monitoring of children's safety.

- ***The failure to provide basic health care services.*** DSS fails to ensure timely medical, dental and mental health assessments, periodic screens and required treatment for children in DSS custody. The 2014 DSS Plan documents a "lack of medical assessments, medical or dental records on file or collateral contacts made with medical providers to obtain assessments or documentation of appointments, make referrals to address medical issues" as well as a lack of "medications and contacts with service providers." The 2014 DSS Plan also found that "appropriate referrals… were not made," including "psychological evaluations" and "mental health screenings." The 2010 DSS Annual Progress and Services Report (the "2010 DSS Annual Report") similarly found that many foster children's medical needs are not monitored and children frequently do not receive needed follow up treatment.

8.      As a result of these three deficiencies, the Plaintiff Children are harmed and subjected to ongoing risks of harm by DSS in specific ways.

9.     As a direct result of the drastic shortage of foster homes, children in foster care, including very young children, are unnecessarily institutionalized. As admitted in the 2014 DSS Plan, DSS "did not regularly" place children in appropriate settings.  Similarly, DSS admitted in its own press release in 2010 that it "overrelies on congregate care facilities for our children, when research shows that children have better outcomes when placed in families." The most recent federal data, comparing state performance in 2012, shows that South Carolina DSS had *the single highest rate of institutionalizing young children age 12 and under in the United States*. Absent rare circumstances when children require highly specialized restrictive settings, DSS's use of facilities and institutions, particularly for younger children, is grossly inappropriate and harmful, unnecessarily wastes taxpayer dollars, and leads to damaging effects on children's developmental, social and emotional functioning.

10.     Also as a direct result of the lack of foster homes, children with emotional, behavioral or psychological disabilities who require intensive foster care services are denied placements and services that meet their treatment needs while in DSS custody.  According to DSS data, over the past five years, DSS has identified thousands of children in foster care who have disabilities, particularly children with intensive emotional, behavioral or psychological needs who require therapeutic community-based, home-like placements and mental health services, but for whom no such placements and services were available. As a result, these disabled children are often either denied treatment or unnecessarily segregated from the general population and housed in grossly inappropriate institutions and group facilities in order to access mental health treatment.

11.     In another harmful direct result of the foster home shortage, children in foster care are frequently moved unnecessarily among multiple homes and facilities, when professional

standards and DSS's own policy recognize that multiple moves inflict severe emotional and psychological harm to children and damage their ability to form trusting relationships with adults. According to 2013 DSS data, over 600 children had three different placements just in their first year of custody, and for 2012, over 900 children experienced *six or more* placements during their current stay in DSS custody. The 2014 DSS Plan admits that the "stability of placements" for children in foster care "seemed to be affected by capacity, matching of children with families and identifying causes of acting out and intervening before a disruption was imminent."

12.     The shortage of homes even causes some children in foster care to be unnecessarily housed in juvenile justice detention facilities. When children in DSS custody are placed in detention or other juvenile justice facilities, DSS has a pattern or practice of recommending that they remain there, without a pending charge or awaiting a hearing or determination on their charge or beyond the term of their plea or adjudicated sentence specifically because DSS has nowhere else to house them. This practice is unnecessarily punitive and extremely harmful to children's physical, emotional and psychological well-being.

13.     As a direct result of the excessive caseworker caseloads and failure to monitor child safety, foster children frequently suffer maltreatment while in DSS custody. In its 2010 review of DSS, the U.S. Department of Health and Human Services (HHS), Administration for Children and Families (ACF) raised concerns about "inaccurate data" reporting with respect to foster children maltreated in DSS custody. This problem continues today and the DSS data regarding the rate of abuse and neglect is unreliable and masks a much higher rate of maltreatment actually suffered by Plaintiff Children.

14.     Also in terms of safety, according to the 2014 DSS Plan, DSS has failed to meet its own "Wildly Important Goal" to "[i]mprove child safety by increasing the quality of the decisions that control safety and manage risk," with safety adequately assessed in only 62% of cases as of December 2013.  Specific ongoing DSS failings include the failure to conduct any investigation at all when dangerous conditions or possible maltreatment in homes or facilities arise, and, when investigations are conducted, the failure to follow mandated investigation requirements.

15.     As a direct result of the lack of basic health care, children in foster care are denied necessary assessments and treatment and suffer physical, emotional and psychological deterioration while in DSS custody.

16.     As a direct result of both the overburdened workforce and the shortage of placements for foster children, children in foster care are often denied opportunities to maintain critical family relationships. The 2014 DSS Plan admits that the agency "was often unable to place siblings together in the foster system" and was failing "to identify and address barriers that were preventing siblings from being placed together."  For siblings that are separated, DSS often fails to facilitate visits or other contact to preserve those crucial relationships. The 2014 DSS Plan further admits that the "agency did not regularly make concerted efforts to promote, support, and/or maintain positive relationships between children and their parents."

17.     Defendants have failed to remedy the three overarching deficiencies of workload, placement array and health care and the resulting harms and risks of harm to children that directly flow from those deficiencies.  Defendants' violations of Plaintiff Children's legal rights continue despite longstanding notice and knowledge of agency-wide dangers.

18.     Plaintiff Children in this action have waited far too long for DSS to meet its federal constitutional and statutory obligations to children in foster care. These children now respectfully seek specific targeted equitable relief from this Court that is addressed to the failures at DSS, as the executive agency responsible for their safety and care.

## II.     JURISDICTION AND VENUE

19.     This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of the Constitution and laws of the United States.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the Defendants reside in this District and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District.

21.     Assignment to the Charleston Division is proper pursuant to District of South Carolina Local Civil Rule 3.01(A)(1) because the Defendants do business in this Division relating to the events or omissions alleged herein.

## III.     PARTIES

### A.  PLAINTIFFS

**Named Plaintiffs, Collectively**

22.     Defendants' actions and inactions with respect to the Named Plaintiffs are part of a systemic pattern of conduct that has played a role and caused, and continues to cause, irreparable harm.

**Michelle H.**

23.     Michelle H. is a 16-year-old girl in the legal custody of DSS in foster care. Michelle is currently placed at a group facility in Summerville (Dorchester County). Michelle's case is brought by her adult Next Friend, Tamara Coppinger, who lives in Charleston County.

Ms. Coppinger is sufficiently familiar with the facts of Michelle's situation and dedicated to Michelle's best interests to fairly and adequately represent the child's best interests in this litigation.

24.     Michelle first entered DSS custody in Charleston (Charleston County) in November 2007 when she was 8 years old as a result of physical abuse and neglect by her mother. Michelle later disclosed sexual abuse by a family friend while she lived with her mother. Michelle's parents' parental rights were terminated in 2009.

25.     Michelle entered DSS custody with severe hearing loss in one ear. Throughout her entire time in DSS custody in foster care, Michelle has not received medically necessary services to address her medical condition.

26.     DSS first placed Michelle in a foster home in Beaufort (Beaufort County), an hour and a half from her home community. Michelle had been receiving mental health services before DSS removed her; however, after being placed in DSS custody, her services abruptly stopped because DSS placed her far from her home community.  After only several weeks in her first foster home, DSS moved Michelle to an in-patient stay at the Medical University of South Carolina.  After eleven days at MUSC, Michelle was returned to the same foster home in Beaufort, where she remained for three years.

27.     During her three years in the Beaufort foster home, between the ages of 8 and 11, Michelle was repeatedly physically abused by her foster mother, including being beaten with a belt on her arms, legs, back and buttocks. Another foster sibling in the home was also physically aggressive toward Michelle which Michelle's foster mother knew about and encouraged by saying that Michelle "needed it."

28.    In 2010, DSS next moved Michelle to a foster home in St. Helena (Beaufort County). After only one week, DSS moved Michelle again, this time to a foster home in Charleston (Charleston County) in February 2010.

29.    In the spring of 2010, Michelle was referred for mental health assessment, after which she was referred for counseling.  The counseling services stopped in January 2011.

30.    On or about February 2011, DSS next moved Michelle to a foster home in Ladson (Berkeley County) where she remained for about one year. During this time, Michelle was again referred for mental health therapy, but services stopped after only a few sessions. In August 2011, Michelle was given yet another clinical assessment, but she received extremely limited mental health services for the rest of 2011.

31.    After being charged with a juvenile delinquency offense, from November 2011 – January 2012 Michelle was given a community psychological evaluation through the Department of Juvenile Justice (DJJ). During the evaluation, Michelle disclosed that her foster mother at the Ladson foster home had physically abused her, including choking her once, and that the foster mother threatened to "return" her to DSS if she misbehaved. Desperate and scared, Michelle threatened self-harm during this time.

32.    DSS was alerted to Michelle's abuse in the Ladson foster home, but failed to investigate the allegations and ensure Michelle's safety.  Instead, the abuse was eventually reported to DSS's Out of Home Abuse and Neglect Unit by the Department of Juvenile Justice's psychological evaluator.  In response, DSS made a single visit in February to the foster home, concluded Michelle was "in no danger" and took no further action in investigating the abuse. The day after that visit the foster parent requested that Michelle be removed from her home. DSS moved Michelle to a foster home in St. Stephens (Berkeley County).

8

33.    Michelle's DJJ community psychological evaluation again recommended therapy for Michelle. The evaluation noted that "changes in foster home placements may present additional losses" for Michelle.

34.    DSS next moved Michelle to a foster home in Pineville (Berkeley County) in the spring of 2012. After one week DSS moved Michelle to a foster home in Charleston (Charleston County).

35.    Despite feeling rejected by all the different placements she had been shuffled between, Michelle began to form a relationship with her foster mother in Charleston. However, after five months, DSS moved Michelle to the Pinelands Group Home in Summerville (Dorchester County) in October 2012. Michelle's limited mental health services were again discontinued.  Michelle was housed for 15 months at Pinelands, a highly restrictive group care facility for about 40 boys and girls ages 11-18.

36.    After being discharged from Pinelands in April 2014, Michelle was placed back at the same prior Charleston foster home. In May 2014, a mental health assessment concluded that Michelle needed individual counseling once a week and family counseling twice a month. Before any services began, Michelle was sent to the Coastal Regional Evaluation Center (CEC) in Ridgeville (Dorchester County) in June 2014 after she skipped school, which was considered a violation of her probation.  CEC provides court ordered evaluations for male and female adjudicated delinquent juveniles ages 11-17. At CEC, Michelle was given a psychological and psychiatric evaluation and again the assessment concluded that Michelle needed mental health therapy.

37.    At a hearing on her probation violation, although Michelle remained in DSS custody, DSS stated that Michelle's former foster mother no longer was considering adopting her

and DSS had no available placements for Michelle and therefore recommended her continued placement with DJJ for this reason. Michelle was moved back to Pinelands group home through the Department of Justice for 90 days in July 2014.

38.    Although Michelle's 90 day court ordered time at Pinelands expired in October 2014, Michelle is still languishing at the facility today.  At Pinelands, abused and neglected children, along with children serving time on pleas or adjudicated delinquency charges with DJJ, are placed in solitary confinement if they misbehave. They are placed in a bare room where they must stay without any contact with others.

39.    While at Pinelands, Michelle is not provided with adequate hygiene products, including soap appropriate for Michelle's eczema.  After being slammed on her back in an earlier incident, Michelle suffers from back pain. She submitted a medical complaint but has yet to be evaluated by a doctor.

40.     Since being placed back at Pinelands, Michelle has lost weight and is not receiving adequate mental health treatment services. After 12 placements in 8 years in DSS custody, Michelle desperately wants to live with a foster family. However, Michelle's social worker – her third since entering DSS custody – has told her there are not enough foster homes and there is no other place for her.

**Ava R.**

41.    Ava R. is a 15-year-old girl in the legal custody of DSS in foster care. Ava is currently placed in a therapeutic foster home in Summerville (Dorchester County). Ava's case is brought by her adult Next Friend, Tamara Coppinger, who lives in Charleston County.  Ms. Coppinger is sufficiently familiar with the facts of Ava's situation and dedicated to Ava's best interests to fairly and adequately represent the child's best interests in this litigation.

42.     Ava entered DSS custody in Charleston County in December 2013 when she was 14 years old, due to physical abuse and neglect by her mother. DSS first placed Ava at Jenkins Institute for Children ("Jenkins Facility") in Charleston County, where she was housed for ten months.

43.     Jenkins Facility is a group facility that provides "low management residential group care" for approximately 32 girls age 11 – 21 years old. There is no indication that DSS assessed Ava's needs and made a determination that her needs could not be addressed in a foster home before placing her in this group facility.

44.     Ava has been denied basic medical screens and treatment while in DSS custody. While Ava has been in DSS custody for over a year, she has never seen a dentist.

45.     Despite multiple evaluations indicating that Ava required mental health treatment, and despite DSS's knowledge of her need for mental health treatment, Ava did not receive a single therapy session until ten months after she entered DSS custody. During those ten months Ava suffered repeated maltreatment at the Jenkins Facility.

46.     While housed at the Jenkins Facility, Ava was frequently deprived of sufficient food and she and other residents would hoard food supplies when possible. The food that was actually available was often expired or moldy. While Ava was at the Jenkins Facility, at least one resident became ill after eating moldy bread.

47.     While housed at the Jenkins Facility, Ava and other girls were deprived of basic feminine hygiene products, and Ava did not always have enough clothes to wear. The physical conditions were unsanitary and in disrepair. There was feces on the floor of the shower for over a month during Ava's placement. Ava's room did not have curtains for privacy and had holes in the walls.

48.    While housed at the Jenkins Facility, staff withheld Ava's depression medication as punishment. When Ava finally got her medication back, staff laughed and told her not to "overdose" on it. Ava reported this incident to both the President of Jenkins and her DSS caseworker. No action was taken.

49.    While housed at the Jenkins Facility, staff would frequently curse at residents and threaten "beat down[s]" for misbehavior. Fighting among residents was also a regular occurrence, and often was not interrupted until the police were called. Ava witnessed a brawl break out among several residents at Jenkins Facility, including two pregnant teens, while staff watched and did not intervene. The brawl did not end until another resident called the police.

50.    Ava suffered inappropriate touching and sexual advances while housed at the Jenkins Facility. Staff would pat her buttocks to wake her up in the morning and a maintenance worker asked Ava to take nude pictures of herself and provide them to him. Ava reported this to Jenkins staff but no action was taken. The maintenance worker continued to come to the facility.

51.    Ava felt so much in danger at the Jenkins Facility that she ran away to her physically abusive mother's home, but she was found and returned to the Jenkins Facility. This was the only time she saw her mother since DSS removed her and her mother relinquished her parental rights. Still Ava felt that it was her only option and she would rather risk further abuse by her mother than stay at the Jenkins Facility.

52.    The Jenkins Facility was frequently short staffed while Ava was housed there, which prevented adequate supervision of residents. Residents often left the facility and when staff went to find them, the other residents would be left alone. Similarly, because there were often so few staff present, there was limited transportation to school, and as a result Ava often missed school.  Supervision at night was poor, and consequently, young men in the

12

neighborhood would regularly sneak into the facility. One night a young man came in through Ava's window and tried to inappropriately touch her. She got away from him and she later reported the incident to staff. No action was taken and several young men returned two nights later.

53.    Ava attempted to report her maltreatment at Jenkins Facility to her DSS social worker but could often not reach her. When she did report the maltreatment to her DSS caseworker, Ava was told by her caseworker that she had a lot of children on her caseload and so was limited in what she could do to help her.

54.    Ava was also a victim of bullying by other residents, including trashing her room and stealing her belongings. At one point, another resident put an abrasive cleaning product in Ava's makeup. When she applied the makeup to her face, it burned and her face bled. Ava reported the incident to staff, but staff did not intervene and DSS took no action.

55.    Feeling rejected by residents and frustrated by the absence of help from staff or DSS, Ava resorted to self-harm. One incident in August 2014 resulted in Ava being hospitalized after she cut her wrists. While hospitalized, Ava continued to report trauma and depressive symptoms that required intensive mental health treatment. The hospital noted in a letter to DSS that Ava – who had been evaluated as needing therapeutic services in February 2014 - had yet to receive any services because "her current placement has not **ever** provided her transportation for those services" (emphasis in original). Staff at the hospital agreed to release her to DSS on the condition that Ava receive counseling services three days a week.  DSS returned her to the Jenkins Facility but she was still denied counseling services for another three months.

56.    In September 2014, DSS finally determined that Ava was severely emotionally disturbed and required Level 3 Therapeutic Foster Care and that at Jenkins Facility – one of the

many "low management" group facilities that DSS contracts with to house children in foster care in DSS custody – "her needs are not being met." Yet Ava languished at the Jenkins Facility for almost two more months.

57.    In late October 2014, Ava was moved to a therapeutic foster home in Moncks Corner (Berkeley County). Ava finally began therapy sessions, however after a few weeks DSS advised that Ava would be moved again, and the foster parents stopped taking her to counseling.

58.    DSS moved Ava again, this time to a foster home in Summerville (Dorchester County) in late December, right before Christmas. Meanwhile, since Ava's DSS caseworker left DSS in November, Ava does not know who her new caseworker is – this will be her third caseworker since entering DSS custody almost a year ago – and has yet to meet her.

**Zahara L.**

59.    Zahara L. is a 9-year-old girl in the legal custody of DSS in foster care. Zahara is currently placed in a therapeutic foster home in Florence County. DSS has moved Zahara through 13 placements in her four years in DSS custody. Zahara's case is brought by her adult Next Friend, Deborah Wilson, who lives in Lee County. Ms. Wilson is sufficiently familiar with the facts of Zahara's situation and dedicated to Zahara's best interests to fairly and adequately represent the child's best interests in this litigation.

60.    DSS initially removed Zahara from her biological home in late 2010 when she was five years old. Zahara was involuntarily removed, along with her 3-year-old brother, while living in Lee County after DSS received reports of physical abuse in her family's home. After entering foster care, Zahara also disclosed that she was a victim of sexual abuse by a relative.

61.     DSS first placed Zahara in a Lee County foster home with her brother for 3-4 weeks, after which DSS placed Zahara's brother with paternal grandparents and Zahara, after being identified as needing Intensive Foster Care, in a therapeutic foster home.

62.     After only a few days, DSS moved Zahara again, at the age of 5, to be one of the youngest children placed at Seacoast Academy, a secure, locked level III institutional facility in Myrtle Beach (Horry County) that houses 25-38 children ranging from age 5–21 years old placed through both DSS and the juvenile justice system.

63.     While at Seacoast, devastated at the loss of her family connections, Zahara acted out at school and at the facility. Her therapist informed DSS that Seacoast was not an appropriate placement for Zahara. Only age 5, Zahara could not possibly understand, let alone function within, the Seacoast institutional system of levels of privileges and points.  Because Zahara's parents did not have the means to travel 90 miles to Seacoast and DSS did not provide transportation support, Zahara had only one visit with her family in her six months there.

64.     In the spring of 2011, rather than find a less restrictive setting for Zahara, DSS placed her at Three Rivers Behavioral Health facility, in an even more restrictive, high security Psychiatric Residential Treatment Facility designed for older youth in West Columbia (Lexington County). Five year old Zahara was one of the youngest children placed at Three Rivers, which is designed to treat children with severe mental health needs.

65.     While at Three Rivers, Zahara was placed on several powerful psychotropic medications. Zahara described her placement at Three Rivers as the "worst time in [her] life." At age 5 in a grossly inappropriate institutional placement, Zahara threatened to commit suicide. For several months while at Three Rivers, Zahara had no visits with any family members, including

15

her brother. Only after Zahara talked about wanting to die were her grandparents and brother able to visit her and she had two visits with her biological parents.

66.     After approximately six months in Three Rivers, DSS moved Zahara and placed her with her grandparents in September 2011. While there, Zahara briefly received local mental health services, although her mental health treatment providers had been constantly changing due to her multiple moves.

67.     DSS moved Zahara from her grandparents after two months and placed her in a therapeutic foster home in Williamsburg County, her sixth placement.  DSS moved her yet again only two days later.

68.     DSS then placed Zahara in a therapeutic foster home in Nesmith (Williamsburg County), approximately 80 miles from her biological family. While in this foster placement, DSS changed Zahara's therapist again, severing another important relationship in her life. Zahara missed several of her therapy sessions because her foster mother complained that the distance was too far to take her. After about 5-6 months in this home, Zahara revealed maltreatment by the foster parents, and disclosed to a DSS worker that her foster mother tried to "get the devil out of [her]" during a religious service. Zahara revealed that she was forced to go up to the church altar against her will for an extremely long period in a ceremony that would remove the devil from the then 6-year-old's soul.

69.     DSS moved Zahara again, in the late spring of 2012, to her eighth placement, this time to the foster home of a disabled elderly minister in Marion (Marion County), over an hour from her biological family. Zahara had no visits or contact with her brother during the three months she was in this home. However, DSS was allowing Zahara and her biological mother to have unsupervised visits, although DSS had changed her permanency goal to termination of

16

parental rights and adoption. While visiting with her mother, Zahara was encouraged to talk by phone with a man that claimed to be her father and was led to believe she would be returning to her biological home. Zahara's primary DSS caseworker was unaware of this and only after the caseworker was informed by Zahara's guardian ad litem, after 2-3 months of unsupervised visits, DSS required all visits to be supervised going forward.

70.     Desperate, Zahara exhibited suicidal behavior while in the Marion foster home, including trying to stab herself and running into oncoming traffic. DSS moved Zahara yet again, this time to a therapeutic foster home in Dillon (Dillon County), ninety miles from her home community. At this placement, Zahara continued to talk about suicide, and despite several reports to the police by the foster parent out of concern for Zahara's safety, DSS did not intervene or provide more intensive supports.

71.     Instead, after approximately 5-6 weeks, DSS moved Zahara back to the Three Rivers institution in Columbia. This time DSS kept her there, now age 7, for almost a year and a half.  While at Three Rivers, Zahara's treating psychiatrist recommended that Zahara be carefully transitioned out of this level of care because her mental health treatment needs did not require sustained extreme institutional segregation. However, DSS failed to implement a transition plan and decided to remove Zahara without consulting Three Rivers' staff.

72.     In August 2014, the day Zahara was to be removed from Three Rivers, the staff at the facility held a meeting with DSS. At the conclusion of the meeting, DSS changed course and agreed that Zahara should not be moved without a transition plan that included Zahara visiting and having family therapy with her new foster mother over at least a two week period. That same day, however, at 5pm, DSS returned to Three Rivers and removed Zahara without any transition or notification of the deviation from their own transition plan. DSS did not take any of Zahara's

medication with her when she was abruptly moved and the removal was declared by the Three Rivers staff to be against medical advice.

73.     That evening, a DSS psychiatrist wrote Zahara multiple prescriptions for psychotropic medications; however, there is no record that this psychiatrist saw Zahara any time within the prior year, let alone that evening.

74.     DSS next placed Zahara in a therapeutic foster home in Florence (Florence County), her eleventh placement. She remained there for two days before she was moved again, back to Three Rivers. After yet another institutional placement at Three Rivers, in October 2014, Zahara was moved again, this time to a therapeutic foster home, where she currently lives.

75.     During her four years in DSS custody, Zahara has had at least 6 different DSS caseworkers assigned to her, which has further traumatized her and compounded her profound sense of loss and lack of attachment to stable adults in her life.

**Sammy V.**

76.     Sammy V. is a 13-year-old boy in the legal custody of DSS in foster care. Sammy is currently placed at Midlands Evaluation Center in Richland County. Sammy's case is brought by his adult Next Friend, Aleksandra Chauhan, who lives in Richland County. Ms. Chauhan is sufficiently familiar with the facts of Sammy's situation and dedicated to Sammy's best interests to fairly and adequately represent the child's best interests in this litigation.

77.     In September 2014, DSS removed Sammy, then 12, from his mother's home in Columbia (Richland County) for neglect and placed him with a family friend. The next day Sammy was sent to the Midlands Evaluation Center in Richland County for an evaluation stemming from juvenile justice charges that were pending when Sammy was removed.  Midlands

is a juvenile justice evaluation facility. While Sammy was at the Midlands, his mother was arrested and detained.

78.    In October 2014, Sammy was placed in DSS Emergency Protective Custody and immediately placed in the Miracle Hill Boys Shelter, a temporary, emergency shelter housing boys 11-21 and homeless adults in Greenville (Greenville County), over an hour from his home community and his biological family.  After two weeks, DSS moved Sammy to Lancaster Children's Home (Lancaster County), another group facility over an hour away from his biological family. There is no indication that DSS placed him in this facility after a determination that his needs could not be addressed in a foster home.

79.    After only seven days, Sammy was removed from the Lancaster facility because it was determined that his "continued placement would [] become an issue for his safety." Staff at Lancaster Children's Home observed that Sammy was easily agitated, lacked consistency with making good decisions and required close monitoring and frequent redirection. His "Plan of Care and Recommendations and Outcomes" recommended Sammy have access to community services including family counseling, behavioral modification and mental health assessment and be placed with increased supervision and structure. Despite these recommendations, Sammy has not been provided with any mental health assessment or treatment services.

80.    Sammy's behavior and disruption from the Lancaster facility instead was treated as a probation violation, and Sammy was sent to the Alvin S. Glenn Detention Center (ASG) in Columbia (Richland County), a detention facility housing older juvenile delinquents, where he was confined alone for seven days because of his young age, with no peers or contact with anyone other than his attorney and phone access with his DSS caseworker. In addition, Sammy was not provided with any mental health services while at ASG.

81.     While Sammy should have next been placed in a DSS foster placement, Sammy was moved back to ASG because DSS had no available placement for him.

82.     DSS then placed Sammy at New Beginnings of Charleston (Charleston County), a level II/III group home facility almost two hours from his home community and biological family. New Beginnings provides group care intensive services for children ages 10 to 16 in a highly structured setting for both children involved in the juvenile justice system and those who have been abused or neglected.  While at New Beginnings, Sammy suffered physical and verbal abuse by staff, including being grabbed by the arms, slammed on the ground or dragged across the floor. Sammy was also a victim of child-on-child maltreatment when he was inappropriately touched by another resident.  None of these maltreatment incidents at New Beginnings were investigated by DSS.

83.     After less than two weeks at New Beginnings, Sammy was moved back to the jail at ASG. Sammy again was held in effectively solitary confinement, this time for four days, without contact with peers, without mental health treatment or contact with a DSS caseworker.

84.     Sammy was then moved back to the Midlands Evaluation Center because, DSS admitted, it had nowhere in foster care to place him despite his being in DSS legal custody. While at Midlands, Sammy was assaulted by a juvenile corrections officer, leaving him with bruising and scratches. Reflecting the grossly inappropriate placements he had experienced, Sammy was still relieved to be back at Midlands because to him "at least the food is better" than the jail at ASG. Sammy remains at Midlands today while he is on a waitlist for an appropriate DSS placement.

85.     Although Sammy's permanency goal is reunification, he has had limited visits with his biological parents since entering DSS custody. Because DSS has not added Sammy's

mother's name to the visitor's list at Midlands Evaluation Center, she has not been able to visit him since his placement there. Sammy has also had no contact with his siblings, ages 14, 17, 18 and 20, at least two of whom are also currently in DSS custody.

**Andrew R.**

86.     Andrew R. is a 16-year-old boy in the legal custody of DSS in foster care. Andrew is currently placed in a therapeutic foster home in Lancaster County.  Andrew's case is brought by his adult Next Friend, Cheryl Kreider, who lives in Aiken County. Ms. Kreider is sufficiently familiar with the facts of Andrew's situation and dedicated to Andrew's best interests to fairly and adequately represent the child's best interests in this litigation.

87.     Andrew first entered DSS custody in Aiken County in September 2013 when he was 14 years old.  After being neglected by his mother in Jackson (Aiken County), often spending nights sleeping in a public park, Andrew had been living with relatives in Easely (Anderson County). DSS took custody of Andrew and involuntarily placed him in foster care after he ran away from their home and was found on the street by police.

88.     DSS first placed Andrew in the Epworth Children's Home, a group home facility in Richland County, over an hour from both his parents and almost two hours from the relatives with whom he had been living. There is no indication that DSS assessed Andrew's needs and made a determination that his needs could not be addressed in a regular foster family home before placing him in this group facility.  The Epworth Children's Home housed an average of 76 children between the ages of 4 and 18 at any given time.

89.     Staff at Epworth described Andrew as impulsive, restless and constantly agitated, and he struggled with behavior problems. Despite multiple requests by his guardian ad litem that Andrew receive a psychological assessment, during his two month placement at Epworth,

Andrew did not receive any mental health assessments or therapy despite showing signs of emotional duress. Yet at Epworth, Andrew was prescribed a powerful psychotropic medication for the first time in his life. The medication is commonly prescribed to treat bipolar disorder; yet Andrew had never been (and has never been) diagnosed with bipolar disorder.

90.     Andrew was so addicted to cigarettes that he often combed the grounds at the Epworth facility for used cigarette butts. Despite knowing that Andrew had a severe smoking problem, a habit he acquired at age six, other than providing Andrew with a nicotine patch, DSS failed to provide Andrew with any support.  Instead, Epworth staff complained to DSS about Andrew's smoking habit, and in November of 2013 DSS moved Andrew from Epworth and placed him in a foster home in Elgin (Kershaw County), almost two hours from Andrew's biological home.

91.     After three weeks, in December of 2013, DSS moved Andrew yet again, this time identifying Andrew as eligible for Intensive Foster Care and Clinical Services ("Intensive Foster Care"). DSS placed him in another "therapeutic" foster home in Hartsville (Darlington County), two and a half hours from his biological home.

92.     After four weeks, in January of 2014, DSS moved Andrew yet again. DSS placed Andrew in a "therapeutic" foster home in Lancaster (Lancaster County), with a single elderly foster parent with serious health needs.  He remains there today. As a means to control Andrew's behavior, DSS advised his current foster parent not to let Andrew out of the house and instructed that he have no contact with his peers.

93.     During summer 2014, Andrew revealed to a DSS private contractor that he had been sexually abused at the age of six by the son of his father's live-in girlfriend. The social

worker did not report this to Andrew's caseworker; rather, Andrew's guardian ad litem notified DSS of the revelation.

94.     After a forensic interview, specific therapy was recommended to address the sexual abuse, but Andrew did not feel comfortable with the therapist with whom he had the initial session. Despite the urging of Andrew's guardian ad litem to assign him a new therapist and schedule more therapeutic sessions, DSS failed to act and only made new therapy appointments for Andrew six months later after the court ordered DSS to provide a comprehensive mental health evaluation.

95.     Between October 2013 and January 2014, Andrew had been moved among four placements in three months and had not been enrolled in a new school, thereby missing months of school during a critical time of the year. Feeling rejected by three different homes that failed to meet his needs, Andrew described feeling like "trash" and unwanted.

96.     More recently, in September of 2014, after being bullied by other students, Andrew's attendance declined. When contacted by the school, rather than support the school or Andrew's foster parent, the DSS Intensive Foster Care caseworker advised that the school should contact the Department of Juvenile Justice. In October of 2014, Andrew was charged with truancy.

97.     Andrew has had at least four different DSS caseworkers since entering DSS custody a little over a year ago.  The changes in caseworkers have further prevented Andrew from forming a trusting adult relationship.

98.     Andrew's permanency plan remains reunification. However, since entering care there has been a question as to the identity of Andrew's biological father, which DSS has not resolved. Andrew has only seen his mother once since entering DSS custody.

**Marcus B., Annie B., Cameron B., Sara B., and Roger B.**

99.     Marcus, Annie, Cameron, Sara and Roger B., ages 10, 8, 5, 3, and 2, respectively, are siblings currently in the legal custody of DSS in foster care.   Marcus B. and Annie B. are currently placed with their maternal grandparents in Virginia.  Cameron B. and Sara B. are currently placed with their paternal grandparents in Georgia.  Roger B. is currently placed in a foster home in Aiken County.  The B. siblings' case is brought by their adult Next Friend, Margaret Wilson, who lives in Aiken County. Ms. Wilson is sufficiently familiar with the facts of the B. siblings' situation and dedicated to their best interests to fairly and adequately represent the children's best interests in this litigation.

100.    In September 2014, DSS involuntarily removed these five siblings from their mother's home in Aiken, South Carolina (Aiken County) due to neglect and the failure to complete a DSS safety plan. At the time DSS removed the children, their mother's home did not have water and electricity and DSS had concerns about supervision of the children. Immediately upon entry into foster care, due to the shortage of foster care placements, DSS separated all of the siblings from each other and placed them in different placements across the state.  For their first week in DSS custody, the children did not have a DSS caseworker assigned to them.

101.    DSS initially placed 9-year-old Marcus in a foster home in Salley, South Carolina (Aiken County). However, after only three days in that placement, DSS removed Marcus and placed him in Helping Hands, a group home that houses up to 58 children from infancy to 21 years old in Aiken County. There is no indication that DSS assessed Marcus's needs and made a determination that his needs could not be addressed in a regular foster home before placing him in this group facility, rather DSS was just trying to find an available bed for him.

102.    In October, three weeks into his placement at the Helping Hands facility, someone put feces on Marcus's toothbrush and Marcus witnessed an assault by several children in the home. Traumatized, Marcus learned to kick out the window in his room if he was scared and the police would come. In November, in reaction to an incident where another child resident at the facility was trying to take Marcus's teddy bear, staff at Helping Hands took Marcus's teddy bear and he later saw it in the trash.

103.    DSS failed to provide Marcus B. with his required medical assessment when he entered foster care in September.

104.    DSS initially placed 8-year-old Annie in the Bowers-Rodgers Home in Greenwood (Greenwood County), a group facility over an hour from her home community that accepts children from infancy to age 17.  As with her brother, there is no indication that DSS assessed Annie's needs and made a determination that her needs could not be addressed in a regular foster home, before placing her in this group facility.

105.    Within only weeks of her placement in the group home, 8-year-old Annie B. was assaulted by her 12-year-old roommate. Staff at Bowers-Rodgers moved the roommate to another room; however, when new foster children were admitted to Bowers-Rodgers, the roommate was moved back into Annie's room. DSS did not investigate the incident. Additionally, Annie reported to her DSS caseworker that staff at Bowers-Rodgers had kicked her. Staff denied the incident and no further action was taken.

106.    In December, while Annie was still at Bowers-Rodgers, a bed became available at the facility in her brother Marcus's age group. However, DSS failed to move or consider moving Marcus so he or Annie could be placed with one of their siblings.

107.    DSS initially placed Cameron and Sara, 4 and 3 years old respectively, in a foster home in North Augusta (Aiken County), a half hour from their brother Marcus in Aiken and over an hour from their sister Annie in Greenwood. Cameron and Sara did not receive an initial medical assessment when they entered foster care.

108.    DSS initially placed the youngest child, 2 year old Roger B., in a foster home in Aiken County, forty minutes to over an hour from his siblings.  Upon entry into DSS custody in early September, DSS had notice or knowledge that Roger had a bead or other object lodged on his eardrum. Despite the urgency of the situation, DSS did not take the child to a medical professional until the end of October 2014, a month and a half after Roger was placed in DSS's care.

109.    The B. siblings did not have any initial visit or any contact with each other, or with their mother, for three weeks after DSS placed them in foster care and separated them all from each other. Even that initial visit was cut short because several of the siblings were late arriving due to various distances they had to travel, and their mother missed a visit because she did not have transportation and DSS did not provide any assistance.

110.    In late December, DSS placed Marcus B. and Annie B. with their maternal grandparents in Virginia, and DSS is evaluating them to be licensed as foster parents.  Also in late December, DSS placed Cameron B. and Sara B. with their paternal grandparents in Georgia, and DSS is evaluating them to be licensed as foster parents.  Roger B. remains in a foster home in Aiken County.

**Kyle S.**

111.    Kyle S. is a 17-year-old boy in the legal custody of DSS in foster care. Kyle is currently placed in the Pickens County Detention Center. DSS has kept Kyle in DSS custody

since approximately the age of 3, and since then DSS has moved him through 28 placements. Kyle's case is brought by his adult Next Friend, Tamara Coppinger, who lives in Charleston County. Ms. Coppinger is sufficiently familiar with the facts of Kyle's situation and dedicated to Kyle's best interests to fairly and adequately represent the child's best interests in this litigation.

112.    DSS initially removed Kyle and his brother from a relative's home in Beaufort (Beaufort County), when he was 3 years old, due to reports of severe physical abuse. Since being in DSS custody, Kyle was only placed once with his older brother and has had inconsistent visitation and contact with him. DSS has terminated Kyle's parents' parental rights and changed his permanency goal to adoption.

113.    In the course of his 28 placements, DSS has moved Kyle virtually throughout the entire state of South Carolina. Despite moving Kyle through so many different placements, DSS has not evaluated Kyle to assess whether he ever needed a higher level of care or to provide him with any additional mental health support services.

114.    Kyle suffered physical abuse or neglect while in DSS custody. In February 2014, Kyle's foster parent called him the devil and choked and assaulted him in front of the private agency staff that provided the home under contract with DSS. DSS did not investigate this incident.

115.    After this incident, DSS admitted that it had no available placement for Kyle and refused to provide a higher level of care for him. As such, DSS recommended that Kyle be detained in a juvenile justice facility. In May 2014, Kyle was moved to a juvenile justice detention facility for 90 days.

116.    After Kyle was released from the juvenile justice facility, DSS placed him in the Pinelands group home in Summerville (Dorchester County), a group care facility for

approximately 50 boys and girls ages 11-18.  While Kyle was housed there, Pinelands often did not have enough food and he did not receive adequate mental health services. Kyle was also placed at a group home in Ridgeland (Jasper County) in 2014.

117.    In the fall of 2014, DSS placed Kyle at Hampton Psychiatric Residential Treatment Facility, a 55 bed highly restrictive institutional facility in Pickens (Pickens County) for boys ages 5 -21, because a bed was available and DSS had no other available placement for him. This level of placement is reserved for children with the highest level mental health treatment needs. While housed at the Hampton facility, Kyle was initially denied contact with anyone outside the facility.

118.    Cut off from the outside world and frustrated at being moved to yet another placement, Kyle acted out and kicked in a door at the facility.  As a Psychiatric Residential Treatment Facility, Hampton was required to have on site behavioral and mental health intervention services, but instead DSS reported the incident to police and Kyle was arrested and placed in jail in Pickens County.

119.    Although Kyle was able to obtain a personal recognizance bond and remains ready to be released from jail and housed in an appropriate foster care placement, DSS has refused to move him. Because he can only be released to DSS personnel, Kyle has been languishing at the jail for over three weeks solely because DSS has admitted they have no placement for him and that he will likely remain in jail until "mid-January or longer."

120.    After literally growing up in DSS custody, Kyle remains in jail awaiting a foster care placement and at risk of aging out of DSS foster care without any meaningful adult connections in his life, without any support services and without a permanent safe home.

### B. DEFENDANTS

121.    Governor Haley is the Governor of the State of South Carolina and is sued solely in her official capacity.  Under Article IV, Section 15 of the South Carolina Constitution, the Governor is constitutionally-required to "take care that the laws be faithfully executed" and, therefore, is responsible for ensuring that all South Carolina executive departments and agencies, including DSS, comply with all applicable laws.  Governor Haley has controlling authority over DSS, and, as the supreme executive authority, she is ultimately responsible for appointing, and has the power to remove, the Director of DSS.  Governor Haley also appoints members of the board of the Division for Review of the Foster Care of Children (the "Foster Care Review Board"), which is part of the Office of the Governor and is statutorily mandated to make recommendations to the Governor "with regard to foster care policies, procedures, and deficiencies of public and private agencies which arrange for foster care of children. . . ." Governor Haley also appoints members of local Foster Care Review Boards located throughout the state.

122.    Governor Haley currently maintains her principal office at the State House, 1100 Gervais Street, Columbia, S.C. 29201; but has authority and acts throughout the State of South Carolina.

123.    Director Alford is the Acting State Director of DSS and is sued solely in her official capacity.  DSS is the executive agency responsible for supervising and administering the public welfare activities and functions of the State, including activities and functions for the Plaintiff Class and Subclasses as defined herein.  Director Alford is "vested with the duty and authority to oversee, manage, and control the operation, administration, and organization" of DSS.  Director Alford reports directly to Governor Haley.  Director Alford currently maintains

29

her principal office at 1535 Confederate Avenue Extension, Columbia, S.C. 29202; but has

authority and acts throughout the State of South Carolina.

## IV.    CLASS ACTION ALLEGATIONS

124.    This action is properly maintained as a class action pursuant to Rules 23(a) and

(b)(2) of the Federal Rules of Civil Procedure.

125.    The general Class is defined as all children who are or will be involuntarily placed

in foster care in the legal custody of DSS as a result of emergency protective custody (EPC)

and/or a referral, report, suspicion, allegation and/or adjudication of abuse or neglect. The

"Disability Subclass" includes all Class members whom DSS has identified or will identify as

eligible for Intensive Foster Care and Clinical Services, which is defined as children "who have

emotional/behavioral/psychiatric needs of such intensity that they require a specialized out of

home placement" ("Intensive Foster Care"). The "Sibling Subclass" includes all Class members

who have or will have sibling(s) in DSS custody.  The "Juvenile Justice Subclass" includes all

Class members who are "taken" or will be "taken into custody" by the Department of Juvenile

Justice pursuant to S.C. Code §63-19-810.

126.    The Class and each Subclass are sufficiently numerous to make joinder

impracticable.  As of June 2014, according to DSS data, an estimated 3,372 children under 18

years old were in the legal custody of DSS in foster care. A similar number of children currently

comprise, and will continue to comprise, the Class.  In terms of the Disability Subclass,

according to DSS data, in fiscal year 2013 there were 1,600 children in DSS custody who were

determined by DSS to be in need of Intensive Foster Care. A similar number of children

currently comprise, and will continue to comprise, the Disability Subclass. In terms of the

Sibling Subclass, according to federal data, two-thirds of children in foster care nationally have

siblings in care. Upon information and belief, there is approximately the same proportion of children in DSS custody who had one or more siblings while in DSS custody, which equals over 2,200 children based on the total DSS population as of June 2014. A similar number of children currently comprise, and will continue to comprise, the Sibling Subclass. In terms of the Juvenile Justice Subclass, according to DSS data, in January 2012 there were 198 children receiving services from both DSS and the Department of Juvenile Justice. A similar number of children currently comprise, and will continue to comprise, the Juvenile Justice Subclass.

127.    The questions of fact and law raised by Named Plaintiffs' claims are common to and typical of those of each putative member of the Class and the respective Subclasses whom they seek to represent, because each Named Plaintiff and putative Class member is in the legal custody of DSS in foster care and relies on Defendants for his or her safety, health and well-being, and has been subjected to significant known harms and/or the imminent risk of known harms as a direct result of the continuous and systematic legal deficiencies of South Carolina's child welfare system alleged in this Complaint on behalf of the Class and the Subclasses.

128.    Defendants have acted or failed to act on grounds generally applicable to all members of the Class and Subclasses, necessitating class-wide declaratory and injunctive relief.

129.    Questions of fact common to the Class include:

    a.    Whether Defendants, through their actions and inactions, have a pattern, custom and/or practice of failing to maintain an adequate number and kind of foster homes and other appropriate living situations for children, that results in the unnecessary institutionalization of children in foster care, the repeated movement of children from one placement to another, and the deprivation of meaningful contact with family members of Plaintiff Children.

    b.    Whether Defendants, through their actions and inactions, have a pattern, custom and/or practice of excessive caseworker caseloads and an unstable foster care workforce that cannot provide basic monitoring of children's safety, that results in maltreatment and the risk of maltreatment while in

DSS custody, the failure to investigate maltreatment, the failure to follow DSS protocols when maltreatment is investigated, the failure to correct dangerous conditions in homes and facilities, and the deprivation of meaningful contact with family members of Plaintiff Children.

c.  Whether Defendants, through their actions and inactions, have a pattern, custom and/or practice of failing to provide initial and periodic medical, dental and mental health assessments, screens and necessary medical, dental and mental health treatment, that results in the harm and risk of harm and children's physical, emotional and psychological deterioration while in DSS custody.

130.  Questions of law common to the Class include:

a.  Whether Defendants' actions, inactions, patterns, customs and/or practices in paragraph 129 (a) – (c) violate Plaintiff Children's substantive due process rights to personal safety and security and/or their right to be reasonably free from known harms and imminent risks of known harms while in state custody, guaranteed by the Fourteenth Amendment to the United States Constitution; and

b.  Whether Defendants' actions, inactions, patterns, customs and/or practices in paragraph 129 (a) – (c) violate Plaintiff Children's rights to family association and integrity, guaranteed by the Fourteenth Amendment to the United States Constitution;

c.  Whether Defendants' actions, inactions, patterns, customs and/or practices violate Plaintiff Children's rights established by the Medicaid Act under the Early and Periodic Screening, Diagnosis and Treatment program ("EPSDT"), 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(43)(B), 1396a(43)(C), 1396d(a), 1396d(r).

131.  Additional questions of fact common to the Disability Subclass include:

a.  Whether Defendants, through their actions and inactions, have a pattern, custom and/or practice of failing to provide children in the Disability Subclass with intensive emotional, behavioral or psychological needs who require community-based placements and mental health treatment, with medically necessary mental health services; and

b.  Whether Defendants, through their actions and inactions, have a pattern, custom and/or practice of failing to place children in the Disability Subclass in the most integrated setting appropriate to their needs in order to access mental health treatment.

132.    Questions of law common to the Disability Subclass include:

    a.    Whether Defendants' actions, inactions, patterns, customs and/or practices violate Plaintiff Children's rights established by Title II of the Americans with Disabilities Act ("ADA") of 1990, 42 U.S.C. § 12131 et seq.;

    b.    Whether Defendants' actions, inactions, patterns, customs and/or practices violate Plaintiff Children's rights established by the federal Medicaid Act under the Early and Periodic Screening, Diagnosis and Treatment program ("EPSDT"), 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(43)(B), 1396a(43)(C), 1396d(a), 1396d(r).

133.    Additional questions of fact common to the Sibling Subclass include:

    a.    Whether Defendants, through their actions and inactions, have a pattern, custom and/or practice of knowingly failing to place siblings in DSS custody together, and if separated, failing to facilitate visits or other contacts between such siblings; and

    b.    Whether Defendants, through their actions and inactions, have a pattern, custom and/or practice of depriving the Sibling Subclass of meaningful contact with family members.

134.    Questions of law common to the Sibling Subclass include:

    a.    Whether Defendants' actions, inactions, patterns, customs and/or practices violate the Sibling Subclass' rights to family association and integrity, guaranteed by the Fourteenth Amendment to the United States Constitution.

135.    Additional questions of fact common to the Juvenile Justice Subclass include:

    a.    Whether Defendants, through their actions and inactions, have a pattern, custom and/or practice such that when children in DSS custody are placed in detention or another juvenile justice facility, DSS leaves them and/or recommends that they remain there, without a charge or awaiting a hearing or determination on their charge or beyond their pleas or adjudicated sentence, specifically because DSS has nowhere else to house them.

136.    Questions of law common to the Juvenile Justice Subclass include:

    a.    Whether Defendants' actions, inactions, patterns, customs and/or practices violate the Juvenile Justice Subclass' substantive due process rights to personal safety and security and/or to be reasonably free from known harms and imminent risks of known harms while in state custody,

guaranteed by the Fourteenth Amendment to the United States Constitution.

137.    Named Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses that they seek to represent.

138.    The violations of law and resulting harms averred by Named Plaintiffs are typical of the legal violations and harms and/or imminent risks of harms experienced by all Plaintiff Children in the Class, the Disability Subclass, Sibling Subclass, and Juvenile Justice Subclass, respectively.

139.    Each Named Plaintiff appears by a Next Friend pursuant to Federal Rule of Civil Procedure 17(c), and each Next Friend is sufficiently familiar with the facts of the child's situation and dedicated to the child's best interests to fairly and adequately represent the child's best interests in this litigation.

140.    Named Plaintiffs and Plaintiff Children in the Class and Subclasses are represented by the undersigned attorneys who are competent and experienced in class action litigation, child welfare litigation and complex civil litigation. These include attorneys employed by the South Carolina Appleseed Legal Justice Center, a non-profit legal organization, who have substantial expertise and experience in state and federal civil rights litigation on behalf of underserved populations in South Carolina; attorney Matthew T. Richardson, a partner at the Wyche P.A. law firm in South Carolina, who has significant experience in complex litigation in state and federal court in South Carolina; and attorneys employed by Children's Rights, Inc., a non-profit legal advocacy organization, who have substantial experience and expertise in federal child welfare class actions nationally.

141.    Plaintiffs have identified and thoroughly investigated all claims in this action and have committed sufficient resources to represent the Class and Subclasses through trial and any appeals.

142.    Plaintiff Children's counsel knows of no conflict among Class members or among members of the Disability Subclass, the Sibling Subclass, or the Juvenile Justice Subclass.

## V.    FAILURES IN THE SOUTH CAROLINA FOSTER CARE SYSTEM HAVE BEEN WELL-KNOWN BUT UNADDRESSED FOR ALMOST THREE DECADES

143.    For almost 30 years, Defendants have been aware of the numerous systemic failures at DSS and the resultant harms and risks of harm to vulnerable children such as Plaintiff Children, yet have failed to fix these systemic failures or implement reforms to address them.

144.    In a 1985 report, "Management and Performance Review of the South Carolina Department of Social Services," the South Carolina Legislative Audit Council ("LAC") found that DSS had failed to adopt adequate policies and standards for caseworkers to sufficiently ensure the safety of and provide basic services to foster children.

145.    Six years later, in a 1991 report, "A Limited-Scope Review of the Department of Social Services," the LAC found that DSS failed to take adequate measures to ensure that foster homes were safe for foster children in DSS custody, including the failure to do proper background checks and the failure to train foster parents.

146.    In a follow-up 1993 report, the Compliance Review Committee for the Department of Social Services found that DSS failed to sufficiently remedy the deficiencies detailed in the 1991 LAC report and that many foster homes remained inappropriate and unsafe for children.

147.    In 2003, the same problems at DSS remained. In the 2003 Child and Family Service Review (a limited periodic federal review conducted by the Administration for Children and Families (ACF), a division of the U.S. Department of Health and Human Services (HHS)), DSS failed six of the seven safety, permanency and well-being outcomes tracked by the federal review, including safely maintaining children at home when possible and appropriate; providing permanency and stability in children's living situations; preserving continuity of family relationships and connections; and ensuring that children receive services to meet their physical and mental health needs.

148.    According to the 2003 CFSR, foster children were "kept in shelters for extensive periods of time because of a lack of appropriate placement resources," DSS had not made concerted efforts to address the mental health needs of children, and "DSS is not consistently effective in promoting visitation between children in foster care with their parents or with their siblings in foster care."

149.    Another state-level review was conducted in 2007 when then-Governor Mark Sanford issued an Executive Order establishing the Task Force on Children in Foster Care and Adoption Services ("Governor's Task Force"), which identified significant agency-wide problems at DSS and submitted recommendations to the Governor in February 2008.

150.    DSS failed to implement most of those recommendations. For example, upon finding that DSS maintains an overburdened and inexperienced workforce, the Governor's Task Force recommended that DSS "[m]aintain a sufficient work force" of child welfare workers who "directly impact child welfare and protection," in order "to meet the caseload standards established by the Child Welfare League of America." That same year, rather than implement that recommendation, DSS instituted a hiring freeze resulting in the *loss* of hundreds of

36

additional workers and even more dangerously high caseloads and preventing caseworkers from doing their jobs of ensuring the safety, health and well-being of foster children.

151.    As of October 2014, caseloads of child welfare workers continue to be dangerously high.  As found in the 2014 LAC Report, the caseloads of foster care caseworkers and child protective services investigators frequently exceed two times and often exceed three or four times national standards and far exceed DSS's own policy standards.

152.    Finding that DSS maintains a grossly insufficient number of foster homes, the 2008 Governor's Task Force also recommended that DSS "increase the number of foster homes to equal the number of children in foster care." To date, there is still a severe shortage of foster homes. For example, according to DSS data, in 2013 there were over 3,000 children in foster care, yet there were only 2,565 licensed foster homes.

153.    In DSS's 2009 "South Carolina Statewide Assessment," published in advance of the 2010 CFSR ("2009 Statewide Assessment"), DSS recognized that it had failed to maintain a sufficient array of family foster homes and admitted that this lack of placements "lead[s] to children being placed in institutional settings," the state's inability to keep siblings together, and the high rate of placement moves experienced by foster children.

154.    In 2010, in the second round CFSR, South Carolina failed all seven safety, permanency and well-being outcomes measured by the CFSR.  The 2010 CFSR again identified the shortage of foster homes as a "key factor" leading to South Carolina's "low performance." The 2010 CFSR also determined that in only 58 percent of cases the agency "had made diligent efforts to assess and address the risk of harm" and nearly half of children in foster care were not achieving stability in their placements.

155.    The 2010 CFSR also identified the DSS failure to "clearly define[]" its policy and practice standards for new reports [of abuse or neglect] on open cases, which "results in inaccurate data on maltreatment recurrence and maltreatment in foster care and affects the State's ability to make effective case decisions based on child and family history with SCDSS." DSS announced in a press release posted to its website in March 2010 that it was expecting the poor results of the 2010 CFSR and admitted that South Carolina's child welfare system "is falling short of what [DSS] believe[s] it needs to do."

156.    In late 2013, after news of several child deaths involving children who had contact with DSS, the South Carolina Senate created a DSS Oversight Committee to examine DSS policies and practices, and charged it with investigating questions raised regarding over 300 children harmed while involved with DSS since 2009. The Oversight Committee uncovered that nearly a third of DSS workers were shouldering larger than recommended caseloads.

157.    The Legislative Audit Council was also asked by Senate members to investigate DSS policies and practices. The 2014 LAC Report found that DSS child welfare caseloads are "excessive and inequitable from county to county," "[t]here is not an adequate system for screening, investigation, treatment, and placement of children in safe homes when abuse and neglect are reported," and "[d]ata regarding child maltreatment deaths … is not reliable and should not be used as a measure of agency performance."

158.    Despite nearly three decades of repeated notice of dangers to children in DSS custody and multiple opportunities to improve the foster care system, Defendants have continued to ignore those dangers and operate DSS in a manner contrary to law and reasonable professional judgment in deliberate indifference to known harms and imminent risk of known harms to Plaintiff Children, so as to shock the conscience.

VI.    **SPECIFIC FAILURES IN DEFENDANTS' OPERATION OF THE SOUTH CAROLINA FOSTER CARE SYSTEM**

   A.    **DEFENDANTS' DANGEROUS PLACEMENT PRACTICES STEMMING FROM AN EXTREME SHORTAGE OF FOSTER HOMES AND OTHER APPROPRIATE PLACEMENTS VIOLATE THE LAW**

   **1. Defendants Maintain A Dangerous Shortage Of Safe And Appropriate Foster Homes And Other Living Situations For Children in Foster Care**

159.    Defendants have a pattern, custom and/or practice of failing to develop and sustain a sufficient number and array of foster family homes and other safe and appropriate placements for Plaintiff Children.

160.    A foster care system must maintain a sufficient number of foster homes to safely accommodate the number of children currently in custody and additional children as they are reasonably anticipated to enter the system on an ongoing basis.  Widely accepted professional child welfare practices and federal law and policy require that a sufficient array of placement types be available, so that a child's placement is the least restrictive, most family-like placement that can meet the child's needs.  Further, children who are in more restrictive placements should be "stepped down" to less restrictive ones when they are safely able to do so.

161.    Despite these recognized standards, the consistent shortage of foster family homes and other placements maintained by DSS results in children being placed wherever a bed or slot is available and without being matched with placements that can meet their needs, in gross violation of accepted professional practices, federal law and even DSS policies.

162.    In its 2009 Statewide Assessment, DSS recognized that the number of licensed foster homes was not adequate for its foster care population, "limit[ing] the choices of placement" and posing risk of harms of institutionalization and placement instability to Plaintiff Children.

163.    In contrast to the 2008 Governor's Task Force recommendation that DSS maintain at least the same number of foster homes as the number of children in foster care, in June 2013, the number of licensed regular foster homes per child needing regular foster care placement in South Carolina was 0.8 – a shortage that only continued to grow. In November 2014, the number of licensed foster homes per child was 0.4.

164.    Due to DSS's drastic shortage of foster care placements, especially foster homes, DSS exposes Plaintiff Children to specific harms, including: unnecessarily institutionalizing children in foster care, especially young children, for extended periods of time; denying community-based placements and services that meet the treatment needs of children in foster care with emotional, behavioral or psychological disabilities; repeatedly moving children from one inappropriate home or facility to another; separating children in foster care from their siblings and interfering with those family relationships; placing children on a reunification track at great distances from their biological parents and interfering with those family relationships; and unnecessarily housing children in foster care in juvenile justice detention facilities awaiting a hearing or determination on their charge or beyond their sentence or plea specifically because DSS has nowhere else to house them.

165.    According to the 2010 CFSR, DSS's shortage of adequate foster homes, in part, is a direct result of its failure to take sufficient steps to diligently recruit and retain foster families, including families who reflect the racial and ethnic diversity of the children in DSS custody.

### 2.    Defendants Unnecessarily Institutionalize Children in Foster Care, Especially Young Children, For Extended Periods Of Time

166.    Defendants have a pattern and/or practice of relying on overly restrictive non-family group care facilities, and unnecessarily institutionalizing Plaintiff Children – including children aged 12 and under – for extended periods of time.

167.    Federal law, DSS policy and accepted professional standards all mandate that foster children be placed in the least restrictive, most family-like setting that is clinically appropriate to meet their needs. For example, according to the South Carolina Child Welfare Services Practice Model, "[p]lacements in non-family settings should be temporary, should focus on individual children's needs, and should prepare them for return to family and community life."

168.    Defendants grossly fail to meet federal law, accepted professional standards and their own standards. In its 2014 DSS Plan, DSS admits that it does "not regularly put the child in placement settings appropriate for the child – examples included group home settings and shelters."

169.    According to federal data, in 2011 and 2012, more than 20% of all children in DSS custody were placed in group homes and institutions, when many of these children's needs could have been met in less restrictive placements. In its 2011-2012 Accountability Report, DSS admitted that while the in-custody population has declined since 2007, the "market share" of group home providers has remained the same at 24%.

170.    The unnecessary institutionalization of children in foster care by DSS, and the harms caused to Plaintiff Children, are well-known to Defendants. The 2008 Governor's Task Force report found that the insufficient number of foster homes in South Carolina led to children

being unnecessarily placed in institutional settings.  In a 2010 publication, DSS admitted that it "overrelies on congregate care facilities for our children, when research shows that children have better outcomes when placed in families."  In the 2010 CFSR, the federal government found that the shortage of foster homes in South Carolina leads to DSS's "overuse of institutional placements, such as emergency shelters and group homes."

171.    According to the Adoption and Foster Care Analysis and Reporting System, DSS also places children in group homes and institutions as their first or second placement *at more than double the rate* of such placements in the national foster care population.[1] Over 32% of children who entered DSS custody during that year and had one placement were placed in a group home or institution as their first placement, compared to just 14% of such children in the national foster care population.

172.    Additionally, many of the DSS group homes and institutions house mixed populations of children without adequate safeguards. This dangerous practice places children who have been victims of abuse or neglect at risk of further victimization by children with known histories of violence.

173.    The harm to children from the unnecessary use of institutional placement settings is well established. Numerous social science studies, such as the 2002 report by Dr. Richard Barth, "Institutions vs. Foster Homes: The Empirical Base for a Century of Action," consistently confirm that unnecessary institutionalization has a powerful negative impact on all aspects of children's development, especially for young children.

---

[1] AFCARS is one of the U.S. Department of Health and Human Services' child welfare-related data systems.  It collects case-level information from states and jurisdictions on all children in foster care.  All states and jurisdictions that receive Title IV-E money are required to submit AFCARS data twice a year.

174.    Social science studies, such as the 2005 study entitled "SAFE Homes: Is it worth the cost? An evaluation of a group home permanency planning program for children who first enter out-of-home care," have repeatedly shown that children placed in group homes, compared to children placed in family foster homes, spend more time in government custody in foster care, have decreased placement with siblings over time, are less likely to be placed in or near their home community, are more likely to be re-abused, and are less likely to have the chance to develop a close relationship with an adult.

175.    Another predictable consequence of unnecessary institutionalization is that children who are not placed in family foster homes are far less likely to be adopted because they are deprived of relationships with foster parents. The highest portion of children adopted out of foster care – approximately 60 percent, according to the 2008 report by the Governor's Task Force – are adopted by their foster parents.  According to DSS data, in 2012, approximately 30% of children placed in foster family home settings exited foster care to adoption, while 0% of children placed in group homes or institutions exited to adoption.

176.    Defendants' unnecessary institutionalization of Plaintiff Children is particularly severe and harmful with respect to young children, who, according to social science studies such as Dr. Barth's 2002 report and a 2002 report by Dr. Brenda Jones Harden, "Congregate Care for Infants and Toddlers: Shedding New Light on an Old Question," are especially subject to negative effects on their development and social-emotional functioning, delayed language development and poor mental development and adaptive skills.

177.    According to 2012 data from the federal Administration for Children and Families – the most recent year for which comparative national data is available -- South Carolina DSS had the single highest rate in the United States for institutionalizing its foster children aged 12

and younger. According to the same federal data, in 2012 and throughout the past decade, approximately 20% of all children 12 and younger in DSS custody were placed in group homes or institutions, when many of these children could and should have been served in less restrictive placements. DSS has had the highest rate for at least the previous three years; yet, Defendants have failed to address this known problem and the harms and risks of harm it imposes on Plaintiff Children.

178.    Defendants' unnecessary institutionalization of Plaintiff Children also wastes state funds because institutional placements are far more expensive than supporting foster family homes.  For example, the rate DSS pays for placement services at Level 3 group homes – which are often used because DSS lacks enough therapeutic foster homes – is double the rate for Level 3 therapeutic foster homes.  The cost of psychiatric residential treatment centers is six times the rate for Level 3 therapeutic foster homes.

> **3.    Defendants Deny Community-Based Placements and Necessary Treatment Services For Children in Foster Care Who Have Emotional, Behavioral, or Mental Health Disabilities**

179.    Defendants have a pattern and/or practice of failing to provide placements and services that can meet the treatment needs of children in the Disability Subclass.

180.    Children in DSS custody with intensive emotional, behavioral or psychological needs are disabled within the meaning of Title II of the federal Americans with Disabilities Act (ADA).

181.    DSS maintains an inadequate array of therapeutic family foster homes that can provide community based intensive mental health services for children with intensive emotional, behavioral or psychological needs.  As a result, disabled children are often denied the treatment

services to meet their needs, or are unnecessarily segregated and institutionalized in over-restrictive institutions and group facilities in order to receive necessary mental health services.

182.    DSS identifies children eligible for Intensive Foster Care, which is the unit within DSS that serves children "who have emotional/behavioral/psychiatric needs of such intensity that they require a specialized out of home placement" and ensures they "are provided appropriate out-of-home therapeutic placement and other services designed to enhance their emotional and social functioning and well-being."

183.    However, according to a 2011 Joint Citizens and Legislative Committee Annual Report, DSS failed to provide sufficient placements to serve the number of children identified as eligible for Intensive Foster Care. Although 2,268 such children were identified, "due to limited resources, Intensive Foster Care could provide intense case management and support services for only 1,401 of these children in therapeutic placements."  In other words, as a direct result of DSS's placement shortage, DSS failed to provide appropriate placements and supportive mental health treatment services to meet the needs of over 850 disabled children whom DSS deemed to have emotional, behavioral or psychological needs such that "they require a specialized out of home placement."

184.    From 2007 to 2012, instead of increasing the number of therapeutic placements available to foster children who need them, DSS in fact *reduced* the number of therapeutic placements by over 500, according to DSS data.

185.    When assessing a child to determine eligibility for Intensive Foster Care, regional and area DSS offices also determine whether the child is eligible for Interagency System for Care of Emotionally Disturbed Children ("ISCEDC") or other funding streams. ISCEDC creates a "pooled services fund" to "prescribe an interagency service planning process for addressing the

needs of emotionally-disturbed children in DSS custody." ISCEDC funding eligibility is not available for all children assessed as needing Intensive Foster Care placements; however, some DSS reports identify available placements by ISCEDC funding eligibility.

186.    According to DSS data, there were 1,759 children in foster care who were ISCEDC eligible in FY 2012, but there were only 1,079 Intensive Foster Care placements, leaving 680 children with disabilities whom DSS failed to provide placements to meet their treatment needs. DSS's data reveals that, from fiscal year 2007-2008 to 2011-2012, DSS has denied therapeutic placements to over 3,648 ISCEDC eligible children whom DSS itself identified as in need of such placements and mental health services.

187.    For severely emotionally disturbed children who are not placed in ISCEDC/IFCCS placements, they often do not get the intensive mental health treatment they require. In the June 2014 DSS Health Care Oversight and Coordination Plan 2015-2019 ("2014 DSS Health Care Plan"), DSS admitted that "[a]t the current time South Carolina has a very limited pool of private practice Child Psychiatrists not contracted to congregate care facilities open to taking new Medicaid patients."

188.    DSS's failure to place Plaintiff Children eligible for ISCEDC/IFCCS placements in such placements results in only two choices—basic level foster homes or "low management" group facilities, neither of which are structured to provide for their intensive mental health treatment needs. Such placements predictably and frequently disrupt because they are ill equipped to meet children's needs. This causes children to suffer the severe and known emotional trauma of being shuffled among multiple inappropriate placements.

189.    Other children in the Disability Subclass are inappropriately placed in segregated institutional settings in order to at least ostensibly obtain mental health treatment services. DSS's

drastic placement shortage results in the failure to provide disabled children in foster care with the integrated community based placements that they require. Children in the Disability Subclass are often institutionalized unnecessarily in psychiatric residential treatment facilities ("PRTF"), South Carolina's most restrictive type of institutional placement, and in "Level 3" group facilities, which are also highly restrictive, both of which are segregated from non-disabled persons, because these institutions are the only placements DSS has that can provide the services that these disabled children need. As such, DSS fails to place these children in the most integrated setting appropriate to their needs. According to DSS data for state fiscal year 2012-2013, 19% of children identified as needing therapeutic placements were housed in PRTFs or Level 3 facilities.

190. Notably, DSS's ability to maintain a small, insufficient array of therapeutic foster families for Intensive Foster Care/ISCEDC eligible children, indicates that this placement option could be expanded to meet the community based needs of children in the Disability Subclass.

### 4. Defendants Repeatedly Move Children From One Inappropriate Foster Home Or Facility To Another

191. Defendants have a pattern and/or practice of frequently moving Plaintiff Children from one inappropriate home or facility to another, repeatedly disrupting their lives and decreasing stability.

192. Frequent placement moves are widely recognized as harmful to children in foster care. The DSS Foster Care Policy and Procedure Manual specifically states that placement "[c]hanges can be traumatic to children and adults and special efforts should be extended to reduce stress to the extent possible."

193. DSS admitted in its 2014 DSS Plan that "[t]he stability of placements seemed to be affected by capacity, matching of children with families and identifying underlying causes of

acting out and intervening before a disruption was imminent." The 2008 Governor's Task Force found that DSS's "insufficient number of foster homes" leads to "the inability to match children's needs to available foster homes, and an inevitably high number of disrupted placements."

194. In 2012 alone, 26.5% of all children in DSS custody had four or more placements and 14.3% - 929 children - experienced six or more placement settings during their current stay in foster care.

195. According to the National Data Archive on Child Abuse and Neglect, in 2012 almost half of children in foster care in DSS custody for at least one year but less than two years had three or more placements. Seventy-six percent of children in care for 24 months or longer had three or more placements.

196. Instability in foster care placement is a well-known, longstanding practice that harms children in DSS custody. Over ten years ago, in DSS's 2003 Statewide Assessment, DSS reported to the U.S. Administration of Children and Families that "as of November 2002, almost 40% of all children in foster care (regardless of their length of stay) had had four or more placements." In 2009 DSS reported that over one-fifth of foster children in DSS custody had experienced six or more placement settings during their current stay in foster care.

197. In the 2010 CFSR, the federal government reported that DSS's constant and traumatic movement of abused and neglected children from one placement to another is directly caused by DSS's lack of sufficient foster homes and its placement of children is "based on the availability of a bed rather than on the skills and training of foster parents." As a direct result of Defendants' gross failure to provide placement stability, Plaintiff Children suffer significant

known harms or imminent risk of harms from frequent placement changes, including attachment disorders and behavioral and mental health problems.

198.    According to social science studies, Defendants' failure to provide Plaintiff Children with placement stability is particularly harmful.  Children with a higher number of placement changes are known to experience a decreased likelihood of reunification, greater severity of behavior problems and more time in residential care.

199.    The South Carolina Foster Care Review Board recognized the harm caused by frequent placement moves in its 2010 annual report, stating that "[f]or children who have been abused and neglected, the trauma of even one placement into a foster home or group home can have a negative impact on their overall development and jeopardize their ability to become healthy and well-adjusted adults."

200.    Additionally, DSS's pattern and/or practice of frequently and disruptively moving children from one placement to another harmfully disrupts any consistent mental health treatment Plaintiff Children may be receiving (*see also* Section VI.C, *infra*).  As noted in the 2014 DSS Health Care Plan, "[providers] express concerns that when Foster Children are moved from one placement to another, it may take a period of time before they see their new [primary care provider], and authorizations to continue treatment may be held up, creating a loss of momentum in the therapy setting to a point of threatening previously-achieved gains."

### 5.    Defendants' Known Placement Practices Significantly Interfere With Critical Family Ties For Children In Foster Care

201.    Defendants have a pattern and/or practice of unnecessarily and significantly interfering with foster children's meaningful contact with family members.

202.    Federal law, South Carolina state law and accepted professional standards and DSS policies all require the child welfare agency to make reasonable efforts to preserve families and family relationships whenever possible.  The DSS Foster Care Policy and Procedure Manual emphasizes the importance of "maintaining continuity of the child's relationship with his/her parents and siblings" and making "every effort" to place the siblings with the same foster care provider.

203.    The 2014 DSS Plan found that "the agency did not fully utilize resources … to maintain connections, nor was there documentation as to the reasons connections should not/could not be preserved, and whether this was reassessed each year in situations where dynamics may have changed allowing contact." Further, the "agency did not regularly make concerted efforts to promote, support, and/or maintain positive relationships between children and their parents" and there is a "general lack of understanding of the importance of promoting connections in addition to the monthly visitations" among staff.

204.    According to the 2010 CFSR, DSS made concerted efforts to support parent/child relationships in only 30 percent of applicable cases, drastically short of the 90 percent standard set by the federal government.

205.    DSS routinely fails to facilitate visitation for Plaintiff Children in DSS custody with their parents, including when the child's goal is reunification with their parent(s), resulting in the children's loss of critical family ties and relationships. The 2010 CFSR found that Defendants made concerted efforts to ensure that parent-child visitation was of sufficient frequency and/or quality to meet the needs of the family in only 45 percent of cases, again far from the 90 percent standard set by the federal government.

206.    DSS's failure to facilitate visitation between children and parents occurs in part because too often caseworkers are not available to supervise visits, due to DSS's excessive caseworker caseloads and an unstable foster care workforce.

207.    Although placing children near their home communities minimizes the trauma children have suffered from removal, helps children maintain ties with siblings and parents, and avoids unnecessary separation from school, family relationships, friends and other local support networks, due to the drastic shortage of foster homes and other appropriate placements for children, DSS frequently places children outside of their home county, often at great distances from their biological parents' home. Moreover, DSS routinely fails to provide the parents of children in foster care with transportation assistance, further interfering with parent-child relationships and possible reunification, especially when parents frequently lack the means to travel long distances and/or live where there is no access to public transportation.

208.    The 2014 DSS Plan admitted that "[p]roximity of placement was often too far from child's biological family for easy visiting access with the child" which was "often caused by a lack of availability of appropriate foster homes within the child's home community." This problem is not new -- according to DSS data, in fiscal year 2011-2012, 33% of children in foster care were placed outside of their home county. DSS's 2009 Statewide Assessment documents that as of December 31, 2008, approximately one third of children in non-therapeutic foster care placements were placed outside their home county, while DSS's 2003 Statewide Assessment documented that more than a quarter of children in foster care in calendar year 2002 were placed outside of their home county for at least one placement.

209.    Additionally, as admitted in the 2014 DSS Plan, the agency "was often unable to place siblings [in DSS custody] together" and "frequently there was not documented, concerted

51

effort to identify and address barriers that were preventing siblings from being placed together." This pattern and/or practice denies children the opportunity to maintain critical family relationships, causing them severe emotional and psychological harm.

210.    It is widely recognized that, for the great majority of children, separating siblings in foster care is harmful to emotional and psychological well-being, increases separation trauma from being brought into foster care in the first place, and can also impede adaptation to new living environments.

211.    Social science research has found that separated siblings in foster care are at higher risk for a number of negative outcomes, including placement disruption; running away; and failure to exit the system to reunification, adoption, or guardianship.  Girls separated from all of their siblings are at the greatest risk for poor mental health and socialization.

212.    Compounding the significant interference with family relationships caused by DSS unnecessarily separating siblings, DSS often fails to ensure that siblings in DSS custody who are separated have frequent visits and other contact with each other.  DSS acknowledged this failure in June 2014 and reported that developing visitation plans with siblings "to preserve connections continued to be an Area Needing Improvement." In 2009, DSS admitted that additional barriers to sibling visitation include DSS's "lack of coordination" and high caseloads. As a result, siblings who are separated while in DSS custody routinely go months and sometimes years without any contact, causing significant emotional harm and profound damage to this family relationship.

6. **Defendants' Placement Shortage Causes Children in Foster Care to be Housed Unnecessarily in Juvenile Justice Facilities**

213.    Defendants' placement shortage is so severe that they have developed a pattern and/or practice of leaving children or recommending that children in the Juvenile Justice Subclass be left in detention and other Juvenile Justice facilities, without a pending charge, awaiting a hearing or determination on their charge or beyond the term of a plea or adjudicated sentence. This is specifically because DSS does not have any available appropriate placements in foster care for the child.

214.    When children in foster care in DSS custody are subject to a charge or plea or adjudicated sentence for a juvenile delinquency offense, DSS maintains legal custody of Plaintiff Children while they are in the physical custody of the Department of Juvenile Justice.

215.    Once these children have completed their term with the Department of Juvenile Justice, they must be returned to the physical custody of DSS. However, as a direct result of DSS's drastic shortage in the number and type of foster care placements for children in DSS custody, DSS has a pattern and/or practice of failing to immediately take physical custody of a child exiting the juvenile justice system, and recommending that the child be left in a juvenile detention or other juvenile justice facility when that child could and should be served in a foster care facility if one were available.

216.    As described in Section III, in the case of three of the Named Plaintiffs – Michelle H., Sammy V. and Kyle S. – DSS openly admitted that they did not have an available appropriate placement even though these children completed a DJJ term, and DSS thus refused to immediately provide them with a placement in foster care despite there being no pending

charge, unfinished plea or adjudicated sentence. As a result, these children were left in punitive juvenile justice detention placements solely because of DSS's severe placement shortage.

217.    This pattern and/or practice flagrantly violates DSS's own policy that requires DSS to place children in the least restrictive appropriate placement that matches a child's needs with the skills and training of foster parents or other caregivers that can meet those needs.

218.    Leaving children in restrictive detention facilities solely because there is no available foster care placement is also extremely harmful to children's physical, emotional and psychological well-being, is unnecessarily punitive and inflicts further emotional harm on children who have already suffered abuse and neglect in their homes and have fully served a sentence pursuant to a plea or adjudication on a charge of a delinquency or status offense.

## B.    DEFENDANTS' EXCESSIVE CASELOADS AND SAFETY MONITORING FAILURES VIOLATE THE LAW

219.    Defendants have a pattern, custom and/or practice of maintaining an overburdened, inadequately staffed, inexperienced, and constantly changing workforce that does not and cannot adequately monitor the safety, health and well-being of Plaintiff Children or ensure that the homes and facilities caring for them are reasonably free from harm, and that their service needs are being met.

220.    The Child Welfare League of America, a national coalition of private and public agencies that develops child welfare policies and promotes sound child welfare practice, limits caseloads to between 12 and 15 foster children per caseworker and 12 active reports per caseworker performing protective service investigations. The Council on Accreditation ("COA"), a national accrediting body that partners with human service organizations to improve child welfare service delivery outcomes, also publishes widely recognized professional standards and recommends that caseloads for foster care caseworkers be limited to 8 to 15 children per

worker, depending on the needs of the children, and 15 children per caseworker performing protective service investigations.

221.    By contrast, DSS caseworkers, who routinely have mixed caseloads of investigations (both pre-custodial and those involving children in DSS custody), family cases receiving ongoing services and foster care cases, carry total caseloads that grossly exceed any of the CWLA and COA caseload standards by a wide margin.  These excessive caseloads overburden caseworkers and prevent them from performing basic casework in conformance with DSS policy and generally accepted standards of professional child welfare case practice.

222.    The proposed DSS standard for foster care caseworkers is now 14-20 children, with a maximum not to exceed 26 children, 54% higher than professional standards. The maximum proposed DSS standard for investigation/assessment caseworkers is 24 children. However, according to the 2014 LAC Report, DSS has failed by a wide margin to meet even its own excessive maximum caseload standards because of "limited resources."

223.    The 2014 LAC Report found that 57.8% of the 611 caseworkers statewide had caseloads that exceeded DSS standards, 38.5% of caseworkers had caseloads that exceeded the standards by 50% or more, 21.9% of caseworkers had caseloads that exceeded the standards by 100% or more, and 11.3% of caseworkers had caseloads that exceeded the standards by 150% or more.  The 2014 LAC Report also found that 19% of caseworkers statewide were assigned more than 50 children, 11% were assigned more than 60 children and 2.8% were assigned more than 75 children at one time.

224.    According to DSS data from September 15, 2014, 63% of Investigation/Assessment caseworkers across South Carolina have more than DSS's recommended caseload standards.[2]

225.    These excessive caseloads prevent caseworkers from adequately monitoring the safety of foster children and from performing casework in conformance with South Carolina's state law and DSS's policies and within reasonable standards of professional child welfare practice. As found by the 2014 LAC Report, DSS child welfare caseloads are "excessive, reducing the amount of attention that can be given to each child" and "reducing the ability of caseworkers to investigate and prevent child abuse and neglect."

226.    DSS's failure to maintain an adequately staffed workforce is made even worse by the high rate of turnover among caseworkers. According to DSS data, from 2011 to 2013, the annual turnover rate among child welfare workers in foster care increased by more than 12 percentage points, from 16.1% to 28.8% of child welfare caseworkers leaving their jobs. Twenty-seven of the forty-six county directors also left their positions from 2011 through August 2014.

227.    High caseworker turnover at DSS has been an unaddressed, longstanding problem. In 2008, for example, the Governor's Task Force recognized that "high employee turnover rates" have contributed to "a largely inexperienced workforce" and that 45 percent of DSS frontline staff have less than one year of experience as a child welfare worker. In its 2010 Annual Accountability Report, DSS recognized that high turnover among its caseworkers

---

[2] For purposes of this calculation, Investigation/Assessment caseworker was defined as a caseworker who either carried at least 3 Investigation/Assessment cases or had less than 2 cases in each type of service category including Investigation/Assessment.

continues to be a systemic problem, leading to "the loss of years of experience, knowledge, and expertise, and substantial cost in training of new workers."

228.    As found by the 2014 LAC Report, "DSS has not analyzed turnover and has no standard for determining whether its turnover rate is within acceptable limits." Morever, "DSS reported inaccurate turnover rates among child welfare workers in the agency's final report on the federal fiscal year 2010-2014 child and family services plan" to federal reviewers. DSS improperly included employees in functional areas that were not child welfare and did not include workers who left a job in child welfare for another position at DSS or another state agency. As a result, the data provided to the federal government "gives a false impression of the number of full-time child welfare workers on staff" and leaves the agency "unable to diagnose its problems in this area."

229.    The high turnover of DSS caseworkers causes children to repeatedly suffer the trauma of having relationships with caseworkers severed and to endure a lack of much-needed continuity and stability. Social science studies, such as the 2010 "Listening to the Voices of Children in Foster Care:  Youths Speak Out about Child Welfare Workforce Turnover and Selection," repeatedly show that "[t]he effect of workforce turnover is to once again disrupt the development of healthy nurturing relationships with a caring adult…it needs to be acknowledged that youths form bonds with their caseworkers … [and] severing those bonds may harm the well-being of children in care."

230.    Additionally, the excessive turnover of DSS caseworkers compromises the ability of DSS to ensure child safety.  The 2014 DSS Plan states:  "Due to the high turnover rate trend, there is a considerable impact on the Agency's ability to sustain the skill sets that caseworkers receive through training" including the agency's core "Signs of Safety (SOS)" training, which is

the agency's core "practice model" for "equip[ping] leadership, supervisors, and frontline workers with a specific set of tools designed to assess risk and manage safety."  The 2014 DSS Plan specifically lists as an example, "due to the ongoing high turnover rate, the implementation of the SOS statewide is somewhat inconsistent.  As new workers are hired to replace former workers trained in the SOS, there are areas of the state where the SOS is not being imbedded into the practice and there may be a lack of confidence with implementing SOS."

231.    DSS's excessive caseloads, high turnover and inexperienced caseworkers often prevent assigned DSS foster care caseworkers from identifying possible maltreatment of children and safety risks in their placements, harming Plaintiff children and leaving Plaintiff children at imminent risk of harm.

232.    Additionally, these same pervasive problems often prevent DSS caseworkers who perform investigations of reported child abuse or neglect from following mandatory investigation protocols as required by law and DSS policy, harming Plaintiff children and leaving Plaintiff children at imminent risk of harm.

233.    According to the June 2014 DSS Child and Family Services Plan for FFY 2015-2019 (the "2014 DSS Plan"), DSS has failed to meet its own "Wildly Important Goal" to "[i]mprove child safety by increasing the quality of the decisions that control safety and manage risk," with safety adequately assessed in only 62% of cases as of December 2013.

234.    The 2014 DSS Plan found that in reviews of DSS cases, "[m]aintaining monthly visits to assess risk and safety relating to children, safety concerns of parents, assessing all individuals residing in the home including . . . the foster parents and residential provider settings were cited issues."

235.     Policies set forth in the DSS Child Protective Services Policy and Procedure Manual ("DSS Policy Manual") require that DSS direct reports of suspected abuse or neglect of children in DSS custody by a facility/institutional staff member to its Out of Home Abuse and Neglect unit ("OHAN"). According to the FY 2011-2012 DSS Annual Accountability Report, in January 2010, DSS reduced the number of staff at OHAN and transferred the responsibility of investigating possible maltreatment in foster homes to the already overburdened county offices.

236.     Instead of referring allegations of suspected abuse or neglect to OHAN or to a DSS area office investigator when OHAN is not part of the process, as required by DSS policy, if DSS responds at all to indications of child maltreatment of which it has notice or knowledge, DSS has a pattern and/or practice of moving a child out of the facility or home where the child was placed, without assessing or investigating the suspected abuse or neglect, without taking corrective actions concerning the child's placement, and without safeguarding the other children in the placement.

237.     When reports of suspected abuse or neglect of children in foster care are actually directed to OHAN or DSS county office investigators, DSS has a pattern and/or practice of routinely failing to take mandatory steps to investigate the allegations.

238.     According to DSS data reported in 2014, in 25 of 46 counties the investigations of alleged child abuse and neglect were more likely than not to be closed in violation of DSS's own policy. In some instances, DSS found that cases were so poorly documented that it was unclear whether the alleged abuse happened; other cases included documented evidence of abuse but the cases were closed anyway.

239.     According to the 2014 LAC report, in 2013 "nearly one in four children whose abuse or neglect reports were accepted for investigation were not seen by a caseworker within 24

hours, as required by DSS policy." In some counties, 39% of child victims were not seen within 24 hours. The 2014 LAC Report concluded "[a]s a result, there is reduced assurance that abused and neglected children are being adequately protected." Compounding this issue, DSS allows employees to delay decisions on whether to investigate reports for up to 24 hours after they are received. From July 1, 2013 to May 31, 2014, DSS delayed decisions for 866 reports for up to 24 hours and 281 were delayed for more than 24 hours.

240.     As a result of the safety monitoring and oversight failures listed above, the DSS data regarding the occurrence and rate of abuse and neglect suffered by Plaintiff Children in foster care is unreliable and masks a much higher rate of abuse and neglect actually suffered by Plaintiff Children.

241.     The federal government has raised concerns regarding the accuracy of South Carolina's reported data regarding abuse and neglect suffered by foster children.  In the 2010 CFSR, the federal reviewers found that DSS's investigation policies and procedures result in "inaccurate data" with respect to the incidence of "maltreatment in foster care and affects the State's ability to make effective case decisions based on child and family history with SCDSS." This dangerous problem continues today.

> ### C.     DEFENDANTS VIOLATE THE LAW BY FAILING TO PROVIDE CHILDREN IN FOSTER CARE WITH REQUIRED MEDICAL, DENTAL AND MENTAL HEALTH ASSESSMENTS, SCREENINGS AND TREATMENT

242.     Defendants have a pattern and/or practice of failing to provide basic medical, dental and mental health assessments, screens and treatment to foster children in DSS legal custody, subjecting them to known harms or the imminent risks of known harms.

243.     Under federal law, state law and DSS policy, DSS must provide medical and dental assessments, periodic medical/physical and dental health screenings, and follow-up

treatment to Plaintiff Children as required under the "Early, Periodic Screening, Diagnosis and Treatment" ("EPSDT") provisions of the Medicaid Act.  The DSS Foster Care Policy and Procedure Manual expressly provides that it is the responsibility of the DSS foster care caseworker to arrange for "completion of on-going medical assessments" for foster children according to federally-approved EPSDT standards, which include medical and dental assessments and periodic screenings to determine the existence of illnesses, as well as diagnostic and treatment services to correct or ameliorate any illnesses or conditions known or discovered by such assessments and screenings.

244.    According to the 2014 DSS Health Care Plan, under current DSS practice "[a]n initial assessment by a physician is arranged and completed within five working days of a child's entry into foster care," and the "Comprehensive Medical Assessment (current SCDSS Form 3057) is obtained from the physician," and "[a]ll follow up services are arranged and coordinated with medical providers as indicated by the health professional."  Also, "[a]n additional appointment will be scheduled (at the time of the first visit) no later than 30 days from the date of the first appointment [within five days of the child's entry into foster care] to complete a comprehensive assessment and follow Early, Periodic Screening, Diagnosis, and Treatment (EPSDT) protocols."

245.    The 2014 DSS Health Care Plan further provides that "[c]urrently, children in foster care are provided on-going medical, dental and vision screenings according to the federally-approved standards (EPSDT Guidelines – Physician's Provider Manual, Section 2., pp 62-63)" and specified by the EPSDT Periodicity Schedule for children in DSS custody.

246.    However, DSS routinely fails to ensure that Plaintiff Children receive EPSDT-mandated medical and dental assessments, screens and treatment.  In its 2014 DSS Plan, in

61

regard to children's physical health, DSS admitted it "lack(s) [] medical assessments, medical or dental records on file or collateral contacts made with medical providers to obtain assessments or documentation of appointments, make referrals to address medical issues [], medications, and contacts with service providers." In addition, in the 2010 DSS Annual Progress and Services Report (the "2010 APSR"), DSS admitted that "[o]ften dental and eye care is neglected for foster children."

247.    In its 2010 Annual Progress and Services Report, DSS reported that it was not monitoring the medical needs of children in its custody, that those children often did not receive appropriate follow up and treatment, and that these failures usually occur when the child changes placements or is assigned a new caseworker. This failure is especially harmful because placement changes and changes of assigned caseworkers occur with great frequency at DSS (*see* Section VI.A.4, VI.B, *supra*).

248.    DSS's failure to provide consistently and timely required medical and dental health assessments, screenings and follow-up treatment to children in DSS custody directly causes harm to and deterioration of Plaintiff Children's physical health.

249.    In addition to the failure to provide medical/physical health services to children, while federal law, state law and DSS policy require DSS to provide assessments, screenings and treatment for mental illnesses and to ensure that Plaintiff Children's mental health treatment needs are met,  DSS routinely denies these basic mental health services to Plaintiff Children.

250.    According to the 2014 DSS Health Care Plan, under current DSS practice, DSS must ensure that every "[c]hild will be taken to the Department of Mental Health (SCDMH) or a Licensed Practitioner to complete a mental health assessment to include screening for trauma within 24-28 hours and no later than 72 hours" of a child entering DSS custody.  Further, "the

initial clinical appointment to complete the trauma-focused assessment will be scheduled within 7 business days of the initial DSS request for the assessment." The completed mental health assessment is part of the initial EPSDT Comprehensive Assessment for every child in DSS custody.

251.    Additionally, under DSS's EPSDT obligations, "[i]f during the mental health assessment, mental health services and counseling for trauma-related issues are identified, [DSS must ensure that] services are to be provided by the appropriate providers, either through a Licensed Practitioner or the SCDMH."  Periodic psychosocial/behavioral assessments are mandated in the DSS EPSDT periodicity schedule, and DSS must ensure that any ongoing medically necessary mental health treatment for Plaintiff Children is provided, under EPSDT.

252.    In its 2014 DSS Plan, DSS admits to a "lack of current mental health and behavioral health assessments or evidence of recommended services noted in the case file, as well as the failure to follow up and monitor mental health services." The 2014 DSS Plan also indicates that substantial delays in obtaining mental health services and the absence of communication with mental health service providers results in the failure to keep up with recommended mental health services and assessments, and untimely referrals for counseling.

253.    These deficiencies in the delivery of essential and legally required mental health care services at DSS are well-known, longstanding problems. For example, according to DSS's 2009 Statewide Assessment reported to the federal government, DSS admitted to a "lack of documentation to indicate that assessment of mental health needs occurred, and a lack of documented follow up for determining that mental health needs were met when such issues were identified."

254.     In the 2010 CFSR, the federal government identified a scarcity of key mental health services for foster children in South Carolina's child welfare system, such as psychological evaluations and mental health and substance abuse treatment services, which results in waiting lists for these services.

255.     DSS's denial of timely mental health screens and treatment also often results in disruptions of foster children's placements, such as when a child's untreated condition causes the child's behavior to deteriorate and the foster parents are not equipped to address the child's needs.

## VII.     CAUSES OF ACTION

### First Cause of Action

(Substantive Due Process Under the Fourteenth Amendment to the United States Constitution)
(Addressed to Allegations of Deficiencies in Placement Array and Excessive Workload and Safety Monitoring
(Asserted by the general Class; all Named Plaintiffs)

256.     The allegations in paragraphs 1-11, 13, 14, 16-22, Section III, 124-130, 137-142, Section V., Section VI.A.1, Section VI.A.2, Section VI.A.4, Section VI.A.5, and Section VI.B of the Complaint are incorporated herein as if fully set forth.

257.     South Carolina assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect a child from harm and to keep a child reasonably free from harm and risks of harm when it takes that child into its foster care custody.

258.     The foregoing policies and practices of the Defendants, in their official capacities, who directly and indirectly control and are responsible for the policies and practices of DSS, constitute a failure to meet their affirmative duty to protect from harm and keep reasonably free from harm and risks of harm all Named Plaintiffs and Plaintiff Children in the Class, which is a

substantial factor leading to, and proximate cause of, the violation of the constitutionally-protected liberty and privacy interests of all Named Plaintiffs and Plaintiff Children.

259.    The foregoing actions and inactions of the Defendants, in their official capacities, constitute policies, patterns, practices and/or customs that are contrary to law and any reasonable professional standards, are substantial departures from any accepted professional judgment such that they are outside of that judgment, and are in deliberate indifference to known harms and imminent risk of known harms and to the constitutionally protected rights and liberty interests of, all Named Plaintiffs and Plaintiff Children in the Class, such that Defendants were plainly placed on notice of dangers and chose to ignore the dangers notwithstanding the notice, and shock the conscience.  As a result, all Named Plaintiffs and Plaintiff Children have been harmed or are at continuing and imminent risk of harm, and have been deprived of their substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

260.    These substantive due process rights include, but are not limited to:  the right to protection from unnecessary physical, emotional or psychological harm and to be reasonably free from harm while in state custody; the right not to be unnecessarily confined in an institutional setting; the right to care, treatment and services necessary to prevent Plaintiff Children from deteriorating or being harmed physically, psychologically or otherwise while in state custody; the right to minimally adequate safety monitoring of foster care homes and facilities; the right to minimally adequate and timely investigations of allegations and indications of abuse or neglect suffered by Plaintiff Children; and right not to be deprived of meaningful contact with family members.

## Second Cause of Action

(Early and Periodic Screening, Diagnosis and Treatment program of the Federal Medicaid Act,
42 U.S.C. §§ 1396a(a)(10)(A), 1396a(43)(B), 1396a(43)(C), 1396d(a), 1396d(r))
(Asserted by the general Class; all Named Plaintiffs)

261.    The allegations in paragraphs 1-8, 15, 17-22, Section III, 124-130, 137-142,

Section V., and Section VI.C of the Complaint are incorporated herein as if fully set forth.

262.    As a result of the foregoing actions and inactions by Defendants, in their official

capacities, Defendants are engaging in a policy, pattern, practice, and/or custom of depriving

Named Plaintiffs and the Class members of the enforceable rights conferred on them by the

Early and Periodic Screening, Diagnosis and Treatment Program of the federal Medicaid Act (42

U.S.C. §§ 1396a(a)(10)(A), 1396a(43)(B), 1396a(43)(C), 1396d(a), 1396d(r)), to the payment of

and/or to receive initial and periodic health assessments, screens and treatment, specifically

physical health, dental health and mental health assessments, screens and treatment.

## Third Cause of Action

(Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq.)
(Asserted by Named Plaintiffs Michelle H., Ava R., Zahara L., Sammy V., Andrew R.)
and the Disability Subclass)

263.    The allegations in paragraphs 1-8, 10, 15, 17-98, 124-128, 131-132, 137-142,

Section V., Section VI.A.1, and Section VI.A.3 of the Complaint are incorporated herein as if

fully set forth.

264.    As a result of the foregoing actions and inactions of Defendants, in their official

capacities, Defendants are engaging in a policy, pattern, practice, and/or custom of depriving

Named Plaintiffs Michelle H., Ava R., Zahara L., Sammy V., Andrew R., and the Disability

Subclass members of the enforceable rights conferred on them by Title II of the Americans with

Disabilities Act of 1990 and subsequent Americans with Disabilities Amendments Act of 2008,

to placements and services that meet their needs in the most integrated setting appropriate to their needs.

265.    The children in the Disability Subclass are qualified individuals with disability within the meaning of the ADA, 42 U.S.C. § 12131(2).

266.    Defendants are public entities subject to the provisions of the ADA under 42 U.S.C. § 12131(1)(A).

267.    Defendants have failed to administer services, programs, and activities in the most integrated setting appropriate to the needs of children in the Disability Subclass. Defendants have placed children in restrictive, segregated institutional settings.

268.    Defendants have discriminated against the Disability Subclass by denying them the opportunity to participate in and benefit from therapeutic community-based placements and supportive mental health services and affording them an unequal opportunity to participate in foster care programs and services. Defendants have further discriminated against the Disability Subclass in violation of the ADA by utilizing criteria or methods of administration that have the effect of subjecting the Disability Subclass to discrimination on the basis of disability.

269.    Defendants have discriminated against the Disability Subclass on the basis of their disabilities by failing to make reasonable modifications in their policies, practices, or procedures. Reasonable modification of Defendants' polices, practices, or procedures would not fundamentally alter the nature of their services, programs, or activities, but rather would further Defendants' stated goals.

## Fourth Cause of Action

(Early and Periodic Screening, Diagnosis and Treatment program of the Federal Medicaid Act,
42 U.S.C. §§ 1396a(a)(10)(A), 1396a(43)(B), 1396a(43)(C), 1396d(a), 1396d(r))
(Asserted by Named Plaintiffs Michelle H., Ava R., Zahara L., Sammy V., Andrew R. and the
Disability Subclass)

270.    The allegations in paragraphs 1-8, 10, 15, 17-98, 124-128, 131-132, 137-142,

Section V., and Section VI.A.3 of the Complaint are incorporated herein as if fully set forth.

271.    As a result of the foregoing actions and inactions by Defendants, in their official

capacities, Defendants are engaging in a policy, pattern, practice, and/or custom of depriving

Named Plaintiffs and the Disability Subclass of the enforceable rights conferred on them by the

Early and Periodic Screening, Diagnosis and Treatment Program of the federal Medicaid Act (42

U.S.C. §§ 1396a(a)(10)(A), 1396a(43)(B), 1396a(43)(C), 1396d(a), 1396d(r)) to the payment of

and/or to receive initial and periodic mental health assessments, screens and treatment.

## Fifth Cause of Action

(Substantive Due Process Right to Family Association With Siblings in Placement Under
the Fourteenth Amendment to the United States Constitution)
(Asserted by Named Plaintiffs Zahara L., Sammy V., Marcus B., Annie B., Cameron B.,
Sara B., Roger B., Kyle S., and the Sibling Subclass)

272.    The allegations in paragraphs 1-8, 16, 17-22, 59-85, 99-120, 124-128, 133-134,

137-142, Section V., Section VI.A.1, Section VI.A.5, and Section VI.B of the Complaint are

incorporated herein as if fully set forth.

273.    South Carolina assumes an affirmative duty under the Fourteenth Amendment to

the United States Constitution to protect a child from harm and to keep a child reasonably free

from harm and risks of harm when it takes that child into its foster care custody.

274.    The foregoing policies and practices of the Defendants, in their official capacities,

who directly and indirectly control and are responsible for the policies and practices of DSS,

constitute a failure to meet their affirmative duty to protect from harm and keep reasonably free

from harm and risks of harm Named Plaintiffs Zahara L., Sammy V., Marcus B., Annie B.,

Cameron B., Sara B., Roger B., Kyle S. and the Sibling Subclass, which is a substantial factor

leading to, and proximate cause of, the violation of the constitutionally-protected liberty and

privacy interests of Named Plaintiffs Zahara L., Sammy V., Marcus B., Annie B., Cameron B.,

Sara B., Roger B., Kyle S. and the Sibling Subclass.

275.    The foregoing actions and inactions of the Defendants, in their official capacities,

constitute policies, patterns, practices and/or customs that are contrary to law and any reasonable

professional standards, are substantial departures from any accepted professional judgment such

that they are outside of that judgment, and are in deliberate indifference to known harms and

imminent risk of known harms to, and to the constitutionally protected rights and liberty and

privacy interests of, Named Plaintiffs Zahara L., Sammy V., Marcus B., Annie B., Cameron B.,

Sara B., Roger B., Kyle S. and the Sibling Subclass such that Defendants were plainly placed on

notice of dangers and chose to ignore the dangers notwithstanding the notice, and shock the

conscience.  As a result, Named Plaintiffs Zahara L., Sammy V., Marcus B., Annie B., Cameron

B., Sara B., Roger B., Kyle S. and the Sibling Subclass have been harmed or are at continuing

and imminent risk of harm, and have been deprived of the substantive due process rights

guaranteed by the Fourteenth Amendment to the United States Constitution.

276.    These substantive due process rights include the right not to be deprived of

meaningful contact with family members.

### Sixth Cause of Action

(Substantive Due Process Right Under the Fourteenth Amendment to the United States Constitution)
(Asserted by Named Plaintiffs Michelle H., Ava R., Sammy V., Andrew R., Kyle S. and the Juvenile Justice Subclass)

277.    The allegations in paragraphs 1-8, 12, 17-58, 76-98, 111-120, 124-128, 135-142, Section V., Section VI.A.1, and Section VI.A.6 of the Complaint are incorporated herein as if fully set forth.

278.    South Carolina assumes an affirmative duty under the Fourteenth Amendment to the United States Constitution to protect a child from harm and to keep a child reasonably free from harm and risks of harm when it takes that child into its foster care custody.

279.    The foregoing policies and practices of the Defendants, in their official capacities, who directly and indirectly control and are responsible for the policies and practices of DSS, constitute a failure to meet their affirmative duty to protect from harm and keep reasonably free from harm or risks of harm Named Plaintiffs Michelle H., Ava R., Sammy V., Andrew R., Kyle S. and the Juvenile Justice Subclass, which is a substantial factor leading to, and proximate cause of, the violation of the constitutionally-protected liberty interests of Named Plaintiffs Michelle H., Ava R., Sammy V., Andrew R., Kyle S. and the Juvenile Justice Subclass.

280.    The foregoing actions and inactions of the Defendants, in their official capacities, constitute policies, patterns, practices and/or customs that are contrary to law and any reasonable professional standards, are substantial departures from any accepted professional judgment such that they are outside of that judgment, and are in deliberate indifference to known harms and imminent risk of known harms to, and to the constitutionally protected rights and liberty interests of, Named Plaintiffs Michelle H., Ava R., Sammy V., Andrew R., Kyle S. and the Juvenile Justice Subclass such that Defendants were plainly placed on notice of dangers and chose to

70

ignore the dangers notwithstanding the notice, and shock the conscience. As a result, Named

Plaintiffs Michelle H., Ava R., Sammy V., Andrew R., Kyle S. and Juvenile Justice Subclass

have been harmed or are at continuing and imminent risk of harm, and have been deprived of the

substantive due process rights guaranteed by the Fourteenth Amendment to the United States

Constitution.

281.    These substantive due process rights include the right not to be subjected to DSS

practices under which DSS leaves and/or recommends that Plaintiff Children remain in a

juvenile detention facility or other juvenile justice facility without a pending charge, awaiting a

hearing or determination on their charge, or beyond the term of their plea or adjudicated term to

authorize such confinement, because DSS has no available placements.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Children respectfully request that this Honorable Court:

  a.    Assert jurisdiction over this action;

  b.    Order that Plaintiff Children may maintain this action as a class action
        pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

  c.    Pursuant to Rule 57 of the Federal Rules of Civil Procedure, declare
        unconstitutional Defendants' failure to provide for Plaintiffs' safety and
        freedom from harm under the Fourteenth Amendment to the U.S.
        Constitution, and declare unlawful Defendants' failure to comply with the
        federal Americans with Disabilities Act and failure to comply with the
        Early and Periodic Screening, Diagnosis and Treatment program of the
        Federal Medicaid Act.

  d.    Permanently enjoin Defendants from subjecting Plaintiff Children to
        practices that violate their rights and order appropriately tailored remedies
        directed at Defendants to ensure Defendants' future compliance with their
        legal obligations to Plaintiff Children, including, but not limited to, the
        following:

        **RELIEF FOR THE GENERAL CLASS**

        i.    **Availability of Necessary Placements for
              Children.** Defendants shall develop the minimally adequate

71

capacity and array of placements for meeting the placement needs of the Class, including foster homes and other appropriate placements.

ii. **Foster Care and Investigation Caseloads.** DSS shall establish and implement limits on the caseloads and workloads of all case-carrying workers for children in DSS custody, as well as all case-carrying workers performing child protection investigations for children in DSS custody, beyond which such workers cannot ensure reasonable safety and protection to Class members.

iii. **Initial and Periodic Medical, Dental and Mental Health Screens and Treatment.** DSS shall ensure the services and periodicity of initial and periodic medical, dental and mental health screens and treatment for foster children in DSS custody.

## RELIEF FOR THE DISABILITY SUBCLASS

iv. **Availability of appropriate, community based treatment and placements to meet the needs of children with disabilities, specifically children with intensive emotional, behavioral or psychological needs.** DSS shall build the capacity to ensure that children in the Disability Subclass receive emotional, behavioral and mental health treatment that meets their needs and that they are placed in the least restrictive, integrated community based settings.

v. **Initial and Periodic Medical, Dental and Mental Health Screens and Treatment.** DSS shall build the capacity to ensure that children in the Disability Subclass receive services and periodicity of initial and periodic mental health screens and treatment.

## RELIEF FOR THE SIBLING SUBCLASS

vi. **Availability of Necessary Placements for the Sibling Subclass.** Defendants shall develop the minimally adequate capacity and array of placements and services needed to meet the placement needs of the Sibling Subclass.

vii. **Sibling Visitation.** DSS shall develop and implement policies providing for minimally adequate visitation and other contact among children in the Sibling Subclass when they cannot be placed together.

72

**RELIEF FOR THE JUVENILE JUSTICE SUBCLASS**

viii.   **Ending the practice, when children in DSS custody are placed in detention or another juvenile justice facility, of leaving and/or DSS recommending that they remain there, without a charge or awaiting a hearing or determination on their charge or beyond the term of their plea or adjudicated sentence, specifically because DSS has nowhere else to house them.**

e.   **Monitoring / Enforcement.**  The provisions of the Court order entered pursuant to Fed. R. Civ. P. 65(d) shall be monitored by a neutral expert monitor appointed by the Court.  In addition, the Court shall have continuing jurisdiction to oversee compliance with that Order.

f.   Award to Plaintiff Children the reasonable costs and expenses incurred in the prosecutions of this action, including reasonable attorneys' fees, pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and Federal Rules of Civil Procedure 23(e) and (h); and

g.   Grant such other and further equitable relief as the Court deems just, necessary and proper to protect Plaintiff Children from further harm while in Defendants' custody in foster care.

Dated: January 12, 2015                    /s/ Stephen Suggs_____
                                           SUSAN BERKOWITZ, Federal Bar #1305
                                           STEPHEN SUGGS, Federal Bar #7525
                                           SOUTH CAROLINA APPLESEED LEGAL
                                           JUSTICE CENTER
                                           P.O. Box 7187
                                           Columbia, S.C. 29202
                                           Telephone: (803) 779-1113
                                           Facsimile: (803) 779-5951
                                           Email: sberk@scjustice.org

                                           IRA LUSTBADER (*pro hac vice* application
                                           to be filed)
                                           KATHRYN A. WOOD  (*pro hac vice*
                                           application to be filed)
                                           CHILDREN'S RIGHTS
                                           330 Seventh Avenue, Fourth Floor
                                           New York, New York 10001
                                           Telephone:  212-683-2210
                                           Facsimile:  212-683-4015
                                           Email:  ilustbader@childrensrights.org

                                           MATTHEW T. RICHARDSON, Federal Bar
                                           #7791
                                           WYCHE P.A.
                                           801 Gervais Street, Suite B
                                           Columbia, SC 29201
                                           Telephone: (803) 254-6542
                                           Facsimile: (803) 254-6544
                                           Email: mrichardson@wyche.com