**South Carolina Department of Social Services**

**Child Welfare Workforce Assessment, Findings, and Recommendations**

**Prepared by:**
**Sue D. Steib, PhD, LCSW**
**Sue D. Steib Consulting, LLC**
**Submitted October 16, 2018**

# Consultant's Biography

**Sue D. Steib, PhD, LCSW**
**Sue D. Steib Consulting, LLC**

Sue Steib has over forty-five years of child welfare experience including direct practice, agency administration, research, and consultation. Prior to becoming an independent consultant in 2016, she was Senior Director of Strategic Consulting at Casey Family Programs (CFP), a foundation dedicated to helping child welfare systems across the United States improve their practice and outcomes. During her eight years at CFP, she led the organization's work in Louisiana and Oklahoma, joining with child welfare leaders there in their efforts to reduce the need for out-of-home care for children. Additionally, she served as part of a consulting team providing support to child welfare systems in fifteen states. From 2001 to 2008, Steib was director of the Research to Practice initiative at the Child Welfare League of America (CWLA) in Washington, DC, leading work to synthesize current research in child welfare and related fields and make it accessible to agency leaders and practitioners across the nation through papers, workshops, and direct consultation. Steib came to CWLA after a thirty-one year career in Louisiana's child welfare system, where she served in positions ranging from caseworker and casework supervisor to administrator, leaving as the statewide child welfare program director.

Particular areas of interest and expertise include the child welfare workforce, agency administration and leadership, evidence-based practice, and using data to assess performance and guide quality improvement.  Most recently Steib played a major role in assessments of the child welfare systems in Philadelphia, Iowa, and Indiana.

**Table of Contents**

I. Introduction and Purpose                                                                          1

II. The Assessment                                                                                      1

III. A Brief Summary of Child Welfare Workforce Research                          2

IV. Findings                                                                                                 6

V. Recommendations                                                                                16

VI. Implementation                                                                                   22

VII. References                                                                                        23

Appendices

A. List of Documents Reviewed                                                               25

B. Interview Questions                                                                            26

C. Resources                                                                                           34

D. Comparison States                                                                             35

**I. Introduction and Purpose**

This document reports the findings and recommendations resulting from a workforce assessment conducted during July through September of 2018. The assessment was conducted pursuant to a request by the Co-Monitors in the Michelle H. v. McMaster settlement agreement which was finalized in October 2016.  That agreement pertained to the care and treatment of children in the custody of the S. Carolina Department of Social Services (SCDSS) and included, among other provisions, the establishment of caseload standards for case managers and supervisors overseeing services to children in out of home care and periodic benchmarks for reaching those standards in each of the out of home care programs of foster care, adoption, Out-of-Home Abuse and Neglect (OHAN) investigators, and Intensive Foster Care Services, a program designation for children with behavioral or developmental diagnoses.

During the time since entry into the settlement agreement, SCDSS has been unable to reach agreed upon caseload standards.  Although additional staff positions have been allocated, turnover is such that hiring efforts have, at best, struggled to keep up with vacancies as they occur in the existing allocation.  This fact led the Co-Monitors to recommend that an assessment of conditions affecting the frontline workforce be conducted and recommendations made to guide SCDSS in developing and executing a plan to stabilize the workforce and reach and maintain established caseload levels.

**II. The Assessment**

Although the provisions of the Michelle H. settlement pertain only to services provided to children in the custody of SCDSS, this assessment addresses the child welfare workforce as a whole.  When viewed from the perspective of the children and families who are the subjects of the agency's intervention, it is not possible to separate the continuum of services into truly discrete programs.  The quality and timeliness of work in the assessment of child protection referrals and in family preservation has an unavoidable effect on both the number and complexity of cases that arrive in the custody programs and the reverse is true as well in the case of families that are followed after children are returned home from foster care or who experience a re-referral to the system.  Further, the "front end" programs that serve families before children enter out of home care represent the best opportunity in child welfare to prevent trauma and the additional negative outcomes associated with repeat maltreatment and separation of families.  Lastly, child welfare personnel who remain in their jobs for more than a short time very often move from one part of the continuum to another making issues like qualifications, training, agency culture and climate, and compensation relevant across the entire workforce.

The findings of this assessment are based on the review of multiple documents, interviews with SDCSS services staff at the direct practice, management, and administrative levels as well as with training personnel in the University of South Carolina (USC) Center for Child and Family

Studies, child welfare leaders and human resources directors in several other states, and review of the findings of child welfare workforce research.

Documents reviewed include the Michelle H. complaint, settlement agreement, and reports, SCDSS policies, job descriptions, staffing reports, human resources policy related to pay raises and performance evaluation, and salary scales. A listing of these documents may be found in Appendix A.

Interviews were conducted with a total of 57 SCDSS personnel in 33 sessions and with three USC employees who provide training to SCDSS staff. All interview subjects were informed that their participation was voluntary and that their names would not be connected with any information they provided. Interviews were structured with some variations in questions based on the position of the subject(s). Questions were added spontaneously when needed to probe additional issues of relevance to workforce recruitment, hiring, retention, and performance that were raised in interviewees' responses and comments. The standard questions asked of each position are contained in Appendix B. All interviews were conducted by the workforce consultant who took detailed notes of responses. In most, but not all, telephone interviews a representative of the Co-Monitors was introduced to the participants, listened, and also took notes but did not ask questions. In-person interviews were done only with personnel in the SCDSS central office and were conducted by the consultant alone. Data were analyzed through the identification of common themes relating to workload, hiring and selection, turnover, staff development, performance assessment, and the workplace environment.

### III. A Brief Summary of Child Welfare Workforce Research
The findings and recommendations of this assessment and report are best understood in light of what is currently known about factors that are linked to recruitment, retention, and performance of front line child welfare personnel.

*Recruitment, Selection, and Hiring*
Developing a competent and stable child welfare workforce begins with attracting and hiring the right people. However, as agencies experience higher numbers of vacancies and rates of turnover, they may react by reducing staff qualifications and/or abbreviating interviewing and selection processes. Unfortunately, these measures, while they may enable the filling of vacancies more quickly, typically drive up turnover further since they tend to bring in people who may be desperate for immediate employment but who lack the basic competencies for or commitment to the work.

Workforce research has identified features of individuals who are best suited for careers in child welfare. Entry level competencies include personal traits such as self-efficacy, caring or empathy in response to the needs of others, adaptability, and strong skills in organization and planning, verbal and written communication, interpersonal relations, observation and analytical thinking.[3] A listing of these evidence-informed competencies along with behavioral characteristics to assess them has been developed based on work done at the National Child

Welfare Training Institute at the University of Southern Maine and the Jordan Institute for Families at the University of North Carolina and is incorporated in the *Staying Power* toolkit that is available online (see Appendix C). This toolkit also includes interview and assessment protocols designed for evaluating the aptitude and skills of child welfare job candidates.

Realistic job previews in the form of videos that depict caseworkers performing and discussing various aspects of their jobs are now commonly used and have been linked in some research with a reduction in turnover.[8] These videos are typically made available on the agency or personnel system website so that prospective job applicants can view them before even completing an application. The U.S. Children's Bureau has collected these videos and makes them available on the Internet via the Child Welfare Information Gateway (See Appendix C, 6.). Additional strategies for recruitment such as aggressive outreach to university social work programs and agency-university partnerships supported with federal Title IV-E funding have shown particular promise. Such partnership programs usually provide students with stipends in exchange for a commitment to work for the agency for a specified period of time (e.g., two years) and have demonstrated great potential to reduce turnover and improve performance.[2]

There is substantial evidence in child welfare workforce research extending back over more than thirty years that indicates that graduation from an accredited social work program is the best educational preparation for work in child welfare.[5, 10, 26] A national review of training competencies established by state agencies found little variation in the knowledge and skills expected of case managers. These included an understanding of theories of crisis intervention, human behavior, child development, family systems, attachment and bonding; the impact of grief, separation, and loss; knowledge of ethics and skills in interviewing. Such knowledge is not intuitive and can be reasonably acquired through agency pre-service training at only a cursory level. The same national review found that, with few exceptions, state training programs allotted little or no time for practice and developing the skills needed to work effectively with families.

Unfortunately, there are only a few states or counties that now require formal social work education. The past four decades have seen a pattern of increasing the responsibility statutorily assigned to public child welfare systems with little commensurate focus on the adequacy of the workforce. Many observers have suggested that this is in part because recipients of child welfare services are perceived by policy makers as being a small minority of the population and primarily those who are deeply impoverished and otherwise marginalized by special developmental or mental health needs. More recently, however, the analysis of large data sets accumulated nationally over time has found that, during the course of their childhoods, more than one-third of American children may be subjects of at least one child protection investigation. For African American children, the proportion rises to about one half.[14] This finding casts child maltreatment as a major public health concern. It also points to the enormous responsibility placed on child welfare agencies and the critical importance of having personnel with the clinical knowledgeable, skill, time, and support necessary to intervene effectively to prevent the needs of these children and their families from escalating to levels that require more intensive and costly intervention.

Finally, there is evidence that better alignment of starting salaries with those of other types of work having similar requirements and demands is important. Although salary is discussed in this report primarily in relation to turnover, it can also be a factor in recruitment. Nationally, overall, child welfare workers make about $9,000 per year less than personnel in jobs that require similar preparation, but have equal or greater complexity and demands making it difficult for child welfare agencies to compete in a market that offers other opportunities for the same candidates.[22] A national child welfare workforce survey found that starting salaries that are not commensurate with the demands of the work or comparable to those in other jobs with equal or lesser qualifications and work were the top two problems in staff recruitment.[1]

*Historical Perspective on Turnover*

It is important to note that public child welfare in the United States has not always been plagued with the level of difficulty it now experiences in attracting and retaining qualified staff. There was a time, albeit now in the distant past, in which child welfare was a very attractive and competitively sought work setting for academically prepared social workers.[7] It was not until the passage of the federal Child Abuse Prevention and Treatment Act in 1974, and the subsequent enactment of more expansive reporting laws in the states, that child welfare agencies, which had traditionally sought graduate level social workers, began to reduce qualifications for their positions in order to hire staff in sufficient numbers to respond to what became an unanticipated avalanche of child maltreatment reports. Costin, Karger, and Stoesz (1996) wrote that this development, typically termed the "de-professionalization" of child welfare resulted in

"…the assumption of the interchangeability of baccalaureate degrees, the reorganization of jobs to reduce educational requirements, the substitution of experience for education, and the non-recognition of the exclusivity of bachelor's and master's degrees in social work." (p. 158) [6] Such is principally the picture of public child welfare staffing in the United States today as are the persistent concerns with workforce sufficiency, stability, and performance.[15, 21]

*Factors Associated with Turnover*

Workforce research extending back over the past thirty years has identified a constellation of factors associated with turnover and, conversely, with retention. They include: [12]

- Lack of competent, supportive supervision;
- Pay that is not commensurate with the demands of the job and not competitive with other work settings requiring the same or lesser levels of education and/or involving similar demands and complexity;
- Long or inconsistent hours and unpaid overtime;
- Stress and fear (related to personal safety, liability, and legal ramifications);
- Inability to achieve an acceptable work/life balance;
- Lack of opportunities for advancement;
- Extensive paperwork and other burdensome administrative requirements that reduce the time available to spend with children and families;
- Conflicts with and/or demeaning treatment by the court and legal professionals;
- Lack of autonomy/discretionary authority;

- Low public regard;
- Unreasonably high workloads; and
- Rigid and unsupportive organizations

Those cited most frequently and most reflective of the findings of this assessment in SCDSS are discussed further below.

*Supervision*

No single factor is as consistently associated with turnover and retention as supervision.[13, 22] Studies point to the importance of both competent and supportive supervision as a critical element in retention.  In order to fulfill their important role in the child welfare organization, supervisors need advanced knowledge and skills in both practice and management.  Unfortunately, many child welfare agencies, SCDSS among them, report having higher than recommended supervisor to caseworker ratios and the absence of professional development structures designed to prepare and support supervisors.

*Workload*

Although findings regarding the role of workload in turnover are mixed, there is little question that unreasonably high workload demands compromise outcomes for children and families when they mean that caseworkers are unable to promptly and thoroughly perform critical functions.[22] One measure undertaken to control workloads is "over hiring" which means over-filling jobs in relation to anticipated vacancies in order to create a pool of personnel who are trained and ready to begin work.  Some agencies have also adopted casework teaming which allows for more than one member of the supervisory unit to be involved with a family and thus able to continue to provide support if a team member leaves.[4]

*Compensation and Benefits*

The lack of alignment of the demands of child welfare work with the compensation provided is now well recognized as a contributor to turnover.  At least two national studies have cited the lack of competitive pay as a key factor in hiring and maintaining child welfare staff.[1, 26]

Although having a social work degree has typically been associated with lowered incidence of turnover, differences in pay between child welfare and other social work settings may contribute to loss of BSWs and MSWs.  A study that examined reasons why graduates of a Bachelor of Social Work agency-university partnership program left after four years found that transfer to more lucrative work was among the top five reasons.[2]  Research exploring retention of MSW graduates also found that compensation was a prominent reason for leaving or planning to leave child welfare.[18]

*Organizational Culture and Climate*

Organizational culture refers to the norms governing work and behavior within an organization, while climate describes the impact of the work environment on worker's well-being.  Climate, in particular, has been associated in research with turnover.[11, 20] Opportunity for advancement is one aspect of climate that may be especially important.  A recent secondary analysis of a large data set on turnover in one public child welfare agency showed particular links between

turnover and both opportunities for advancement and the degree to which employees felt that their expertise was rewarded by the organization.[20]

Other research has found that agencies do not benefit from reducing turnover in terms of outcomes for children absent a proficient organizational culture. Such a culture is described as one that consistently promotes knowledge and skill development in personnel and is oriented toward the attainment of positive outcomes rather than process compliance.[27]

*The Significance of Turnover*

Staff turnover in child welfare agencies is costly, both fiscally and in terms of outcomes for children and families. It is estimated that agencies lose an investment of about one third of a caseworker's annual salary when that employee leaves.[5]

Most significantly, studies have shown that turnover is negatively related to child permanency and safety. A Wisconsin study found that 74.5% of children who experienced only one caseworker attained permanent placement in families outside of foster care. However, with a single change of caseworker, that number fell dramatically, to 17.5%; only 5.2% of children who experienced two changes of caseworkers achieved permanency.[9] Likewise, research conducted in Colorado found that a single change of caseworker during the year long period of the study diminished the odds of a child's attaining permanency during that time by 56% .[19]

In other research, a study of twelve counties in California defined as having high (23% per year), moderate (13%), and low (8%) staff turnover found that low turnover was associated with lower maltreatment recurrence, more approved case plans, and more current child health services.[17]

Analysis of data gathered in the initial federal Child and Family Services Reviews indicated that turnover was linked with agencies' failure to meet performance standards. Specific areas of deficiency cited in the findings included (1) adherence to response time in child protection investigations; (2) timely closure of investigations (an important factor in workload and in families' need for resolution); (3) frequency of caseworker contact; (4) maltreatment recurrence; and (5) timely attainment of permanency for children in out of home care.[25]

Finally, turnover is demoralizing to staff and may build on itself. Vacant positions when caseworkers leave create additional workload and other hardships for remaining staff, thus increasing the likelihood that they will also leave the agency.[26]

## IV. Findings

Analysis of the information gathered in this assessment points to both strengths and challenges related to the workforce in SCDSS:

*Strengths*

- SCDSS staff who participated in this assessment demonstrated strong commitment to the work they do and to improving services to children and families.

- County and state leaders and managers consistently cited the commitment of their respective staffs as a strength.
- Some actions already taken by DSS, such as the creation of training positions in the state office and plans to initiate partnerships with university schools of social work, demonstrate recognition of critical needs within the agency and actions already either conceived or undertaken to meet them.
- Despite changes in leadership and significant resource limitations, DSS has developed a core of professional middle managers, regional leaders, and county directors who are well attuned to the agency's workforce needs.

*Challenges*

- The level of pay and advancement opportunities are clearly inadequate to attract and retain highly qualified, high performing front line staff.
- There is no formalized relationship with state university schools of social work to promote recruitment of new graduates or continuing education for employees in the area of study most closely aligned with child welfare practice.
- Nothing in the agency's pay and classification structure encourages the hiring of professional social workers or incentivizes staff to obtain graduate social work education or remain at the front lines of practice as they grow in knowledge and experience.
- There is a lack of infrastructure for the ongoing professional development of child welfare staff at all levels.
- Workloads are uneven and unreasonably high in some counties and/or units.
- Many supervisors are themselves carrying caseloads and/or supervise more than five caseworkers, the standard recommended by the Child Welfare League of America and set by the agency itself for the majority of its child welfare programs.
- There is not yet a clearly understood and uniformly embraced model of practice or resources to support the consistent application of key practices currently endorsed by the agency. As an example, supports for family team meetings, a critical component of practice, are unevenly distributed and notably lacking in some counties.
- There is lack of infrastructure for the timely development and distribution of agency policy.
- The lack of local resources for placement of children in out of home care results in case managers assigned to serve these children and their families spending an extraordinary amount of time driving and transporting children for family visits and other activities, thus limiting the time they have available for actual casework with both children and their parents or other permanency resource.

*Caseloads and Workloads*

Caseloads are varied, with some counties and/or programs reporting caseloads in out of home care that are within the limits established in the SCDSS workload plan while others are well in excess of those standards, and in some instances more than two times as many children and/or families.

The amount of travel required by caseworkers handling foster care cases was a consistent theme in interviews conducted in this assessment.  Workloads for case managers in out of home care are said to be exacerbated both by high travel demands and the lack of support staff.  Because of a shortage of placement resources, children are often placed with foster families in other counties, sometimes far across the state.  Some portion of transportation as well as other routine administrative duties could be handled by well-trained support staff but counties consistently report that they either lack any such positions or do not have them in sufficient numbers.  It was learned that about 80 caseworker assistant positions exist around the state and that stipends for foster parents are intended to include compensation for transportation.  However, interview data strongly suggest that these resources are not sufficient to meet the need.

SCDSS contracts with external transportation providers and they are reported to be heavily used.  Such providers can be a valuable and appropriate resource for adult clients in various DSS programs.  Their use for children in out of home care, however, raises serious questions about safety, the provision of emotional support in stressful situations such as trips to court, family visits, or medical and mental health appointments, and continuity of care when a trip for a child may involve the need to communicate important information to or from a service provider.  When caseworkers are inexperienced and lack sufficient expert supervision, as appears to often be the case in SCDSS, the potential for such a resource to be misused in services to children is great.

SCDSS has projected that it needs 670 additional case managers to meet the caseload standards for foster care, adoption, OHAN, and IFCCS.  No target figures have been provided for assessment and family preservation although these are among the highest caseloads in the agency.  One middle manager commented that limits on assessment caseloads are "not even discussed".  Although the non-custody programs are not included in the Michelle H. plan, they are critical parts of the child welfare workforce continuum and performance in them directly affects outcomes in out of home care.  A recent DSS analysis found that, of caseloads that included 40 or more children, 78 percent were in the family preservation program.  If, as in most systems, these cases are largely voluntary, this finding raises questions about the criteria used to accept and keep cases open and the degree to which supervisors and managers are trained and empowered to manage workloads.  Further, counties consistently report that intakes have increased since implementation of the regional centralized intake units (or "HUBs"), earlier this year.  SCDSS reportedly screens in for assessment 70% of reports compared to a national average screen-in rate of 58%.[24]

In the custody programs, separate case managers are assigned to adoption, Out of Home Abuse and Neglect (OHAN), and Intensive Foster Care and Clinical Services (IFCCS). Specialized assignment for OHAN investigations is reasonable and, while these are handled by local child protection personnel in some systems, may even be considered necessary given that such investigations should be completed by staff not otherwise involved in the case. This consultant's primary concern regarding OHAN relates to its current staff shortage and its centralization in the state's capital, making it more difficult for staff to respond promptly to reports from around the state. The goal is eight assessments per case manager per month, but the actual caseload is reported to be as high as 30 to 35. In addition, one of the two supervisory positions is vacant and the individual in the other is out on extended medical leave following an automobile accident. The centralization of these staff in Columbia creates a need for more travel and difficulty in meeting 24 hour response times. It is, however, understood that efforts are underway to regionalize these staff. Five new positions have been created for the OHAN unit and these new hires will be placed in the regions.

The need for the assignment of specialized caseworkers for the adoptions and IFCCS functions is more questionable. Regarding adoptions, it is understood that policy provides that the foster care case manager retains case responsibility with adoption staff assuming only the functions that are specifically adoption related or, perhaps in some counties, taking over as the primary case manager just at the point of the adoption. Thus for much, if not all, of the time an adoption case manager carries a case, another case manager is also assigned. If, as in most systems, the majority of children are adopted by their foster care givers, thus eliminating functions related to identification of an adoptive placement, it seems that adoption support activities, if separated at all, might be handled by staff having larger caseloads than the 17 approved in establishing the caseload standards. Even when adoption planning calls for placing a child with a new family, this can be done by the foster care caseworker given reasonable workloads and appropriate skills and supervision.

While the designation of separate adoption staff became common in child welfare systems in the U.S. in the 1980s, a number of child welfare professionals are now questioning whether separation of this function is needed or even advised since, depending upon the way in which the adoption role is fashioned, assignment of an additional or different caseworker can disrupt continuity for the child and family. In the case of S. Carolina, this consultant questions whether having an additional case manager, with a caseload of 17 children, is the best use of the agency staff resources given the acute shortages currently existing elsewhere in the continuum of services.

IFCCS staff are assigned to children who have been determined to have higher behavioral health and/or developmental needs causing them to require specialized placement and more intensive case management. These case managers are to see children at least twice per month, rather than once, as is the requirement for other children and are presumed to have advanced skills that allow them to provide clinical assessment and services. They may also be assigned to children's families but typically are not unless all children in the family receive IFCCS. At least two issues of concern are identified related to this program designation: First, this consultant

found no evidence that IFCCS staff do, for the most part, possess any higher level of training and/or demonstrated skills than other case managers in addressing the clinical needs of children with identified behavioral or development challenges.  Secondly, assignment of the caseworker based solely on the needs of the child detracts from an emphasis on a family-centered approach which is most conducive to timely permanency planning.  While diligent oversight of all children in out of home care is a critical and essential function, it is the needs of the parents that must be addressed aggressively and expeditiously if the issues that called for out of home placement are to be resolved and the child either returned home or moved to another safe permanent family outside of the foster care system.  All staff overseeing the placements of children in out of home care should have the ability (and the directive) to plan frequency of visits based on the child's individual needs whether those are related to children's behavior and development, current events or circumstances, needs in the foster family, or the progress of the permanent plan.

Caseworkers in smaller counties are often assigned mixed caseloads.  In some of those, combined caseloads were very high even if assignments were within caps for some or all of the individual programs.  In one such county, for example, a caseworker reported having a current caseload consisting of one foster child, five assessments, 24 family preservation (families), and three adult protective services.  Her co-worker gave a count of five foster children, 14 family preservation (families), seven assessments, and one adult protection.  Combined caseloads are necessary in many if not most systems when the volume of cases of one type do not constitute a full caseload in smaller counties.  In the case of child welfare assignments, this is not of particular concern beyond the need to ensure reasonable workloads.  One might even argue that, from the perspective of families and children, having one caseworker assigned to the full continuum of services is preferable since it avoids caseworker transitions that are agency-driven as families move from one part of the service continuum to another.  However, assignments outside of child welfare, such as in adult protective services, call for case managers to be conversant with an entirely different set of policies, laws, and practice techniques and thus carry the possibility—indeed, the probability—of diluting their focus on learning and practicing those skills and decision making criteria that are unique to child welfare.  Adult and child protection may seem like similar functions but they are in fact vastly different and, in some states, are handled by entirely separate agencies.

*Compensation*

Overall, the compensation and work classification system at SCDSS presents as one constituting the front line child welfare caseworker position as an entry level job only.  Such a workforce does not at all align with the myriad and complex needs of seriously troubled children and families who, absent effective intervention, will penetrate even further into the state's public assistance, mental health, and juvenile and criminal justice systems.  Low pay and lack of opportunity for advancement were the most consistently cited reasons for turnover and intent to leave among case managers in this assessment.  While workload is, as reflected above, a very serious concern for many staff, compensation concerns everyone.  Managers and supervisors

also cited it as a factor in hiring, as many prospective job candidates refuse to accept the work based on the pay.  They report that efforts to hire applicants with advanced educational qualifications or experience at higher than entry level salaries are rarely successful and, as a result, are often not even requested.  This is reportedly rooted in the fact that, when positions are authorized, they are funded only at the base rate of the pay scale.  Thus, any increase in salary must be funded from elsewhere in the agency's budget.

The DSS Pay Plan provides a salary range for each of ten pay bands.  Child Welfare caseworkers and supervisors fall within pay bands 4 and 5.  Pay band 4 is assigned a minimum salary of $36,311 for child protection investigators/assessors and $34,733 for other child welfare case manager positions.  The midpoint salary for case manager positions other than those in IFCCS, is $38,460 and the maximum is $49,932.  More indicative of actual pay, however, is the current state average which is $35,559 annually.  IFCCS caseworkers fall within a higher pay band and have an average salary of $37,064.  It was reported that, prior to 2015, pay was ten to fifteen percent less across positions.  The overall average pay makes it clear that, despite limited provisions for salary increases or assignment of salary up to the maximum amount in a pay band, very few staff actually receive salaries at the middle or upper reaches of the pay ranges.  By way of reference, the median income in S. Carolina is $46,898 and the estimated living wage for one parent and one child is $47,070 per year.[16, 23]

Base pay for supervisors, other than those in IFCCS, is currently $37,763 for those who supervise child protection investigators/assessors and $36,122 for those who supervise other case managers.  Midpoint pay is $46,799 and maximum is $60,760.  Average pay for supervisors is $40,772, reflecting a figure nearer the minimum of the range than the midpoint or maximum.  It should also be noted that the base pay for supervisors of other than child protection and IFCCS staff is actually $189 per month less than for case managers in child protection.  IFCCS supervisors fall in a higher pay band than others in the service continuum and are currently paid an average of $44,711.

The DSS Pay Plan provides for certain circumstances in which salaries above the minimum and/or current salary can be considered.  These include "exceptional qualifications", advances in education, and changes in duties.  All increases granted in DSS must be approved by the Director of DSS or Deputy Director for Administrative Services.  There is no higher rate of pay for staff with advanced degrees or baccalaureate degrees in social work.  There is also no standardized increase associated with attainment of a MSW.  Policy provides that up to a 5% increase may be granted but is contingent upon a specific request that documents how attainment of the degree is related to the employee's duties.  Given that child welfare is, in fact, social work, this provision seems unnecessary and obstructive.  In contrast, the pay scales for teachers in S. Carolina tie each advancement in education to an increase in pay both at entry and across the range (See Appendix C).

Interview data obtained in this assessment reflect a perception among many personnel in the counties and regions that the process for authorizing salaries beyond the minimum in a range that is currently in place in DSS is subjective and inequitable.  Several specific instances were

related in which individuals applying for vacant positions were offered substantially lower salaries than the one who formerly held the position despite their possessing equal or greater experience and qualifications.

There are no provisions in the pay plan for regularly occurring salary increases based on experience or performance evaluation.  Increases within pay grade typically occur only when cost of living increases are enacted by the legislature, an event that was described as infrequent and normally amounting to only a few percentage points of salary.  There is also no career path for case managers that provides opportunities for advancement in pay and status as they gain experience and additional training.  Promotion to supervision, middle level management, or one of the specialized case manager or program coordinator positions associated with IFCCS or OHAN affords the only opportunity for advancement.  Thus, career incentives for staff are largely limited to movement into positions in which most of the children and families served by child welfare no longer stand to benefit in a direct way from their advanced expertise and experience.  Based on data compiled from exit interviews conducted from January 2017 to June 2018, the need for higher pay and advancement opportunities was a factor in at least 37% of staff departures.

It was regularly reported by SCDSS personnel who were interviewed that counties bordering Georgia and North Carolina lose staff to higher paying jobs in the child welfare agencies of both of those states.  North Carolina's Mecklenburg County reportedly pays at least $10,000 per year more for caseworkers.  Georgia recently granted its staff a 19% raise and now has a three level system that allows staff with MSWs or BSWs to advance to the third level within two years.  Starting salary in the level one case manager positions is $35,387.99, $38,926.72 in level two, and $42,879.47 in level three.  Georgia continues to report turnover of 27 per cent, down from 36 per cent.  North Carolina was not included as a comparison state in this assessment as it is county administered whereas S. Carolina is state administered.  However, the reported loss of staff in S. Carolina counties bordering Mecklenburg County suggests that SCDSS would do well to explore salaries in the bordering counties of North Carolina in its upcoming salary study.

SCDSS staff are required to contribute 9% of their pay to the state retirement system.  While the existence of a pension plan is a positive, the fact that employees lose 9% of the buying power of an already substandard salary is not.  It should be noted that the living wage calculation referenced above specifically excludes allowance for any savings or entertainment.[16]

Overtime work, which is paid in some systems, is typically accommodated in SCDSS only through flexible hours or accrual of compensatory time.  It was reported, however, that workloads in many counties and/or programs preclude staff being able to flex or use compensatory leave.

Finally, the way in which retention efforts have resulted in bonuses and increases being awarded to some staff but not to others based on hire dates has resulted in salary compression and in some supervisors being paid less than case managers.  Bonuses targeting only certain job

functions have caused considerable dissatisfaction among staff who did not benefit. This is not surprising given the minimal level of pay across front line jobs.

*Selection and Hiring*

Data reports provided by SCDSS show that turnover in case manager, supervisor, and program coordinator positions last year was almost 32 percent.  For the first quarter of 2018, it was 11 percent compared with 9 percent for quarter one in 2017 and 7 percent in 2016.  The time required to fill vacancies occurring due to turnover and for new case managers to become certified result in protracted vacancies that then create more overwhelming workloads for caseworkers and supervisors remaining in the office and potentially contribute to further turnover as these personnel are driven to seek other employment opportunities.  SCDSS personnel interviewed who held positions involved in hiring often referenced wide variations in time required to get approval to fill vacancies, to have positions posted, and hiring recommendations processed.  Delays in this process sometimes result in new hires missing the start of pre-service training and having to wait until the next session which can delay their ability to assume responsibility for cases by three months or more.

While case manager positions are continuously posted, the same is not true for supervisors or those in the OHAN unit which are classified as Program Coordinators.  Administrative approval is required to fill all positions.  Because a departure from the agency requires pay out of the employee's unused annual leave, budgetary limitations dictate that approval to fill is sometimes delayed in order to compensate for this payout.  Such delays were described as typically brief, but still constituting another factor that can contribute to extension of vacancies.

Some interview data indicate that the hiring pool for DSS is less than adequate.  The agency was described as being generally perceived as an undesirable place to work due to pay that is lower than other areas of state employment requiring comparable qualifications and a negative public image.  This consultant heard the term "desperation" used repeatedly in relation to staff recruitment and selection along with the comment that it often leads to hiring applicants who are under qualified or otherwise poorly suited for the work.  SCDSS does not use a realistic job preview to provide applicants with insight into the demands of the work nor does it have a standard interviewing and competency-based selection protocol informed by child welfare workforce research as is used in a number of other states.

A recent analysis shows that staff with less than one year of experience account for 42 percent of all turnover.  This suggests that the agency's selection, hiring, and onboarding practices are not correctly identifying individuals with the interest and entry level competencies for child welfare practice and that new hires are not being sufficiently supported in their orientation to the work.

Turnover and the constant need to hire for vacancies in previously existing jobs was given as the reason that DSS has been unable to fill the 163 positions newly authorized in the current year budget.  Further, the existing contract and physical space for pre-service training often does not accommodate the number of new hires who need to attend in a single session.

In many states, partnerships with state university schools of social work are a major source of recruitment.  Federal title IV-E funding helps to support such programs and enables agencies to work with universities to offer stipends, tuition payment, and agency-based internships to both baccalaureate and masters level social work students.  As a condition of participation in such programs, students commit to work for the agency for a year for each year of tuition and/or stipend payment.  In some systems, they are certified at graduation and thus are not required to participate in pre-service training since they have already had agency experience in internships and course work that prepares them for their roles.  New Jersey, for example, cites its partnership with Rutgers University as a key factor in its having now achieved a workforce that consists almost entirely of social work graduates and maintaining a turnover rate of less than 10%.  California, Pennsylvania, New York, Louisiana, Georgia, and Maryland are just a few of the many other states who rely heavily on contractual relationships with schools of social work in their state universities in recruiting new personnel and providing graduate level social work education to existing employees.  The Georgia Department of Family and Children's Services advises that it currently pays nothing for its university partnership aside from providing some administrative support associated with coordination and drawing down federal IV-E funds, as all matching monies are provided in kind by the seven participating universities through instructors' salaries.

SCDSS currently has no relationship with state university schools of social work beyond its contract with USC for training.  This lack was recognized by many middle management personnel who feel that the agency is missing an excellent opportunity to recruit those most well-suited for child welfare work.  Some of the veteran staff interviewed had, in fact, obtained their MSWs many years ago when the agency did have such a partnership and spoke of their regret that this opportunity was no longer available to their newer colleagues.

*Professional Development*
There is no formal plan or pathway for ongoing professional development for staff and little infrastructure to provide it.  SCDSS has recognized this lack, however, and has now hired an agency-wide training director and a child welfare training director with plans to build in-house training capacity.  A training plan is being developed with support of consultants at Chapin Hall Center for Children at the University of Chicago.  Concern remains, however, about the time that this will take and whether sufficient resources will be available.

DSS human resources policy calls for all classified employees to have performance appraisals annually and describes a generic appraisal process that applies to all positions within the organization. Staff interviewed indicated that there is not a lot of investment in the evaluation process because (a) many feel that it is unfair to evaluate staff who are so significantly overloaded as many in the agency currently are and (b) the annual evaluations are not tied to any consequence except in the reportedly rare instance that an employee is being

recommended for termination. Evaluation conferences are, therefore, not routinely used for the identification of learning needs and creating a plan to meet them in the coming year.

Each region has from two to four "performance coaches" who are intended to assist in coaching and training of staff. A number of staff reported that they had received meaningful guidance and support from these individuals. However, it is understood that these positions have no requirements for advanced preparation or training and that their actual work assignments vary with some also being assigned to carry cases.

*Supervision*

Although the supervisor to caseworker ratio in many units is within the recommended one supervisor to five case managers, it was reported in some instances to be as high as one to nine and several supervisors stated that they either currently or in the recent past have had to also supervise staff in other units when supervisory vacancies occur.

Supervisors in some counties are themselves carrying cases. Based on the most recent data provided, 83 supervisors are managing at least one case, 72 of those have caseloads up to 24, and six have more than 40. Given the importance of the supervisory role in child welfare and its demonstrated relationship to staff turnover and performance, the findings related to higher caseworker to supervisor ratios and the incidence of supervisors carrying multiple cases are particularly concerning.

Of additional concern is the fact that there is currently no established onboarding process to prepare supervisors for the lynchpin role they play in the child welfare agency. Although supervisors reported that there are a few training courses designed specifically for them, they consistently said that they had not attended them until after they had supervised for at least a year. DSS has recently announced a "Leadership Academy for Supervisors" that consists of a one-hour orientation and five six-hour sessions leading to award of a certificate in leadership. It is described, however, as being only for supervisors who are ready to move into leadership, who have been on the job for at least one year, and who are recommended for participation. The nature and importance of the supervisory role in child welfare warrants investment in immediate training and mentoring that specifically prepares supervisors to model, teach, and assess practice skills, build a supportive learning culture within their units and offices, and recognize and address policy, resource, and knowledge and skill barriers to the achievement of the best outcomes for children and families.

Lastly, DSS lacks a structure that provides opportunities for ongoing systematic input from supervisors concerning policies, resources, workload management, and staff development needs. As occupants of the position that links practice and administration, supervisors can provide leadership with insight into these and other issues that directly affect the agency's ability to achieve its mandate in protecting vulnerable children and providing services that strengthen families. Thus they should be valued not only for their role in communicating directives from leadership to front line staff, but for the perspective they can offer to policy makers and planners at the top of the organization.

**V. Recommendations**

The recommendations below are formulated to support DSS' goal of designing and implementing strategies to attain the caseload goals established and approved by the Co-Monitors in December 2016 as well as to provide a foundation for recruitment and retention of casework and supervisory personnel for the full continuum of child welfare services.

**1. Caseload/Workload**

1.1. Establish clear priorities and timelines for hiring to achieve caseloads established and approved by the Co-Monitors in December 2016:

- Foster Care Caseworker - 1 caseworker: 15 children
- IFCCS Caseworker - 1 caseworker: 9 children
- Adoption Caseworker - 1 caseworker: 17 children
- OHAN investigator - 1 caseworker: 8 investigations

This will require (a) identifying specific counties and programs for allocation of positions, (b) ensuring prompt and immediate posting of vacancies to include both existing and newly allocated positions, (c) aggressive recruitment outreach to universities in closest proximity, (d) designation of new hires for these counties/programs as having priority for participation in pre-service training, and (e) engaging with USC Center for Child and Family Studies to determine costs and resources for additional training capacity and space necessary to on-board new hires at the rate required.

1.2. Although not directly pertaining to Michelle H. class members or enforceable by the Court, it is recommended that DSS use the guidelines established by the Child Welfare League of America, the Council on Accreditation, and the Children's Research Center (see Appendix C) to set and make efforts to reach caseloads for child protection and in-home services.

As DSS staff undoubtedly recognize and appreciate, from the standpoint of families, it is not possible to separate the child welfare continuum of services into truly discrete programs. The quality and timeliness of work in assessment and family preservation has an unavoidable effect on the workload and complexity of cases that arrive in the custody programs and the reverse is true as well in the case of families that are re-referred for child welfare involvement. Further, the "front end" programs of the continuum represent the best opportunity in child welfare to prevent trauma and further negative outcomes associated with repeat maltreatment and separation of families.

1.3. Consider the rationale for the existence of specialized positions for adoption and IFCCS in light of current staffing and determine whether these designations actually contribute to improved outcomes for children and families served by DSS. What benefits might be derived from assigning these positions to the standard continuum of services?

1.4. Consider measures to reduce travel time for staff serving children in out of home care. This might include (1) reviewing regional recruitment and retention plan outcomes and developing strategies for increasing the net gain of resource homes against benchmarks; (2) creating

positions to support timely identification of kinship resources in children's counties of origin or in adjoining counties; (3) assuring that new foster parents understand their responsibility to provide transportation and that their compensation for doing so is adequate; and (4) assessing the adequacy of trained support positions to assist in transportation when this is consistent with practice considerations (i.e., nature of the event for which transportation is required). It is understood that SCDSS is working with other consultants to develop and implement strategies for improving the array and utilization of placement resources. This recommendation should, therefore, be considered and adjusted to integrate with the findings of that work.

1.5. Strive to eliminate the assigning of adult protection cases to child welfare staff.  The assignment of mixed caseloads across the child welfare program is understandably necessary in smaller counties and a common practice in child welfare agencies. Child welfare practice does, however, have its own unique competencies.  These include an understanding of human and family development, attachment theory, the potential impact of maltreatment on child development, identification of supports and interventions that match presenting child and parent needs, and the clinical knowledge necessary to accurately complete the safety and risk assessment instruments typically employed in today's agencies.  In addition, the legal frameworks that undergird child and adult protection are very different.  To ask child welfare staff to be responsible for both of these functions carries the risk of diluting their focus on the development of skills in child safety and family functioning. Likewise, the vulnerable adults who are the subject of adult protective services deserve professionals who are uniquely attuned to their needs, available resources, and the legal framework within which protective action can be taken.

1.6. Review intake screening criteria and substantiation rates by referral type to determine whether acceptance of 70% of referrals for assessment is warranted.  Child protection assessments should only be conducted if referrals clearly represent a report of suspected maltreatment in accordance with state law as they constitute a large investment of staff resources and represent substantial intrusion into families.

1.7. Ensure sufficient infrastructure at the central office level for timely policy development and issuance.  It is critically important that front-line staff be able to quickly access policy directives that guide their work.

**2. Compensation and Career Advancement**
2.1. After workload, low pay and lack of opportunities for career advancement were the most consistently cited responses to staff questions about the reason for problems in recruitment and retention and, as stated above, these factors constituted 37% of reasons for leaving the agency given in exit interviews with departing staff.  If S. Carolina wishes to attract and retain high quality personnel in child welfare, it must (1) substantially raise entry level pay and (2) develop a system that grants experience and performance/attainment-based increases at intervals during the individual's career progression.  This requires that the salary study, which is reported to be underway in DSS, be made an immediate priority and its findings reflected in budget requests at the earliest possible point. In examining salaries in comparable areas of

work and in child welfare agencies in other states, especially those in the Southeast, consideration should also be given to turnover in those positions. SCDSS likely has little to gain from placing compensation at the same levels as those in organizations that also have high levels of turnover unless it is clear that such turnover stems primarily from other factors.

2.2. Assess the fiscal impact and request the budget to assign a standard increase above base pay (e.g., 5 percent for BSW and 10 percent for MSW) for staff having social work degrees as is the practice in, for example, Oklahoma. Individuals with child welfare casework or supervisory experience of two years or greater with positive performance history as confirmed by their prior child welfare employer should also be started at a salary at least 5% beyond the base.

2.3. With the Office of Human Resources, review current procedures for approving requests for authorizations of salary above the minimum and for salary increases within pay band and make any changes needed to ensure that they are based upon clear, objective, and consistently applied criteria.  Communicate the procedures and criteria in writing to all staff.

2.4. Examine supervisory and management pay in relation to front line positions and establish base rates and ranges, along with periodic merit-based increases, that ensure that supervisors and managers are compensated at rates higher than front line staff.

2.5. Continue to explore and advance the proposals already initiated to provide repayment of student loans for new graduates in social work and, possibly, in very closely related fields. Attention should, however, be paid to curricula in any programs considered and whether the curriculum includes internships in direct services with a population closely approximating that presenting to the child welfare agency. This should also hold true for consideration of prior job experience as relevant to child welfare.

2.6. Develop a career path that encourages caseworkers to remain in direct service positions while advancing in demonstrated knowledge and skills. Ideally such a "ladder" would afford at least three to four levels that tie the certified attainment of advanced knowledge and skills in selected areas (e.g. working with families experiencing domestic violence, child sexual abuse, chronic neglect) to job descriptions of workloads that combine specialized caseloads with staff mentoring and in-agency consultation.

**3. Hiring, Turnover, and Retention**
3.1. A system should be established to track all positions necessary for compliance with child welfare caseloads and supervisory ratios and all such positions authorized deemed approved for immediate posting upon vacancy.  Rise of child welfare caseloads in any county beyond levels that can be maintained within standard by the number of authorized positions must be addressed immediately by either (a) moving an authorized position that is unnecessary to maintain caseload standards in another location or, in the absence of such position, (b) submitting an immediate request for authorization and budget to increase the staff allocation in the county that is over standard.  This will require (a) ongoing tracking of county workloads and (b) establishing a metric to determine both the volume and time period that constitutes a need for an upward or downward designation of staff need. Such a metric is used in most child

agencies to avoid the need to make staffing adjustments in response to caseload changes that are very small or of very brief duration.

Secondarily, DSS and the state personnel authority should conduct an analysis of the child welfare position authorization, budgeting, and hiring process to determine all of the underlying causes for delays in hiring and identify ways to streamline and standardize the process.  This analysis should be facilitated by a party not directly involved in the HR process and include input from regional and county personnel involved in hiring.

3.2. Implement *Stay* interviews that are conducted by managers for staff at regular intervals (e.g., 60, 90, 180, 260 days) through their first year of work and follow up on needs expressed by interviewees.  Such interviews were part of workforce retention efforts that greatly improved staff stability in North Carolina. Examples of questions include:
- o   Are you getting the tools and training that you need?
- o   Do you have a good relationship with your peers?
- o   What is the fit with your supervisor?
- o   What is the cultural fit with the agency?

3.3. Immediately develop (a) a realistic job preview video that can be accessed on the SCDSS website by prospective applicants and (b) a consistent interview protocol that includes responses to a series of typical case scenarios and at least two exercises requiring the organization of critical case information into a written report.  The federally supported National Child Welfare Workforce Institute (NCWWI) offers resources that can be accessed free of charge to guide development of recruitment and hiring plans and protocols.  One of these is *Staying Power*, a complete hiring and selection protocol that was developed at the University of North Carolina Jordan Institute for Families and has been used successfully in N. Carolina, Louisiana, and other states to reduce turnover through more focused and consistent selection (See Appendix C). Information is also available from neighboring Georgia on the research-based employee selection protocol developed at the University of Georgia School of Social Work, and a compendium of realistic job previews can be accessed on line at the Child Welfare Information Gateway.

3.4. Establish formal partnerships with state university schools of social work to develop (a) a program to recruit baccalaureate social work graduates and (b) to support opportunities, including increased salary incentives, for staff to obtain the MSW.

Ultimately, graduates of the baccalaureate program, having already completed DSS internships, some (perhaps two child welfare courses) specialized course content, and passed the social work licensing examination, should be considered certified at the end of their senior year so that they can move directly into casework positions without the need to go through pre-service training.  If the BSW program includes, as many around the U.S. do, payment of tuition and/or provisions for a senior year stipend as well as an internship, graduates should also enter with a two year commitment to work for DSS.  Technical assistance in accessing federal Title IVE funds to develop and support the agency-university partnership should be sought from the Region 4

office in Atlanta and perhaps from independent consultants with expertise in federal child welfare financing.  A listing of some states having active agency-university partnerships is provided in Appendix D to enable SCDSS representatives to seek peer consultation.  The neighboring state of Georgia, for example, reports having an active agency-university consortium which currently involves seven public universities and operates at no direct cost to the agency.

3.5. Establish clear priorities in hiring for staff with social work degrees, criteria for what constitutes a "related degree" to be only those that include clinical content and internship requirements in settings serving populations closely approximating those presenting to child welfare agencies, and higher hire rates for those with BSWs, and MSWs.

3.6. Develop an "over hire pool" that uses calculation of average vacancy rates to allow for the onboarding of casework staff over and above actual vacancies so that they are already completing training and available to fill vacancies as they occur. Ideally, a trained and certified caseworker from the "over hire pool" would be deployed to shadow a resigning or promoting caseworker as he or she transitions casework responsibility.

**4. Professional Development**

4.1. Institute a process that ensures supervisors are the initial recipients of training and coaching in new knowledge and skills as such content is introduced into child welfare practice. This should begin by ensuring that all current supervisors have been exposed to course content being provided to new staff attending the current pre-service. Participation in such trainings/coaching should not be elective.

4.2. Acknowledge the unique positions of supervisors at the midpoint of the organization (i.e., "touching" both front line staff and management) by creating a structure for them to regularly provide input and feedback regarding program policy, workforce development, internal and external messaging, and any other barriers to the attainment of positive outcomes for families.

4.3. Prioritize supervisors in all professional development opportunities such as stipends to obtain MSWs, additional training/certification in specialty areas, and incentivize through higher pay grades, formal acknowledgment of expertise, bonuses, appointment to special committees and task forces, etc.

4.4. Redefine the current "performance coach" position to clearly call for staff with advanced knowledge, experience, and practice skills and standardize their role in providing clinical and case consultation to front line staff.  As an example, in some systems, staff in comparable positions are required to have MSWs and/or clinical licensure.  These positions should be protected from assignment as case carrying staff.

4.5. Develop a performance appraisal process for child welfare staff at all levels that reflects the values and principles of the child welfare practice model and includes identification of needs for additional learning and skill development.  This might use the format currently issued by the state's personnel system, but instructions for its completion in child welfare staff should

incorporate reference to specific competencies and to professional development in child welfare knowledge and skills.  Implementation of this recommendation will require coordination with the consultants and DSS workgroup involved in the development of the agency's training plan.

4.6. Develop a curriculum for ongoing professional learning and skill building in key areas of practice such as motivational interviewing, solution-focused approaches, behaviors associated with building client trust and working alliance, factors that underlie maltreating behaviors, behaviorally based case planning, and utilization of evidence-based interventions that is accessed through a framework of individualized development planning based on caseworkers' unique learning needs, areas of interest, and performance evaluation.  Ideally, this would ultimately include advanced curricula leading to specialized certification in areas germane to child welfare practice such as assessment and intervention in domestic violence, in families experiencing parental substance abuse, with developmentally disabled parents, and in child sexual abuse.  As in 4.5., detailed planning for implementation of this recommendation requires coordination with the consultants and workgroup developing the agency's training plan.

4.7. Establish an objective process for onboarding of supervisors that includes earlier mutual selection by case managers and their supervisors/managers as candidates for supervisory and management preparation and establishing a track for supervisory skills development to begin immediately for newly appointed supervisors and to continue through their first two years in supervision.  This process, characterized in some systems as a "Supervisors' Academy" would be compulsory and provide both classroom training that begins immediately upon assumption of a supervisory position and ongoing mentoring by an assigned mentor identified based on demonstrated skills in practice and supervision.

4.8. Establish a leadership academy for managers that provides both a standard track and electives for professional development. Curricula and course content should ensure an understanding of:
- fundamentals of management in complex organizations;
- importance of a positive, outcome-oriented organizational culture that promotes transparency and learning;
- practice innovations, and their associated evidence; and
- key factors in the assessment and attainment of child safety, permanency, and well-being.

The above should be subject to ongoing adjustments, drawing on nationally recognized experts (i.e., researchers and model developers/purveyors) to reflect advancements in knowledge and the emergence of new evidence-based and research-informed models and approaches.

**5. Implementation Support**
5.1. Create positions within DSS to oversee implementation of this workforce plan and coordinate with related plans supporting compliance with provisions of the Michelle H. settlement.  The lead of this unit would report directly to the Director of DSS.

**VI. Implementation**

Recruiting and maintaining a qualified, stable front line workforce in child welfare is a multifaceted endeavor.  Jurisdictions that have achieved workforce stability and performance objectives stress that their success is not due to one factor alone. This fact is reinforced by the workforce research summarized in section III of this report.

Implementation of the recommendations of this assessment will require the commitment and oversight of SCDSS leadership and of subordinate personnel to whom responsibility is delegated for specific activities.  It is also dependent upon the successful achievement of other system improvements which are being addressed concurrently in the agency with the support of additional external consultants.  These include, but are not limited to, development of the practice model, a comprehensive training plan, and expanded placement resources.  The degree to which leadership in the department can foster and sustain a culture that supports staff learning and skill development will also determine the extent to which the organization is able to keep personnel whose advanced expertise makes them attractive to other work settings.  It is, however, precisely such personnel who are best suited to address the needs of families served by child welfare.  Finally, and significantly, success will depend upon the agency being resourced at the level necessary to fulfill its statutory mandates and the requirements of federal and judicial oversight.

**VII. References**

1. American Public Human Services Association [APHSA] (2005). *Report from the 2004 Child Welfare Workforce Survey.* Washington, D.C.

2. Barbee, A., Antle, B, Sullivan, D., Huebner, R., Fox, S., and Hall, J. (2009). Recruiting and retaining child welfare workers: Is preparing social work students enough for sustainable commitment to the field? *Child Welfare, 88*(5), 69-86.

3. Bernatovicz, F. (2009). Screening and selection of child welfare staff. Portland Maine: University of Southern Maine, Edmund S. Muskie School of Public Service.

4. Child Welfare Information Gateway (2016). Caseload and workload management. Washington, DC: U.S. Department of Health and Human Services, Children's Bureau. Available at https://www.childwelfare.gov/pubPDFs/case_work_management.pdf

5. Cornerstones for Kids. (2006). Components of an effective child welfare workforce to improve outcomes for children and families: What does research tell us? Retrieved from http://www.childrensdefense.org/child-research-data-publications/data/components-of-an-effective-child-welfare-workforce.pdf

6. Costin, L., Karger, H. & Stoesz, D. (1996). The politics of child abuse and neglect in America. New York: NY: Oxford Press.

7. Ellett, A. & Leighninger, L. (2007).. What happened? Journal of Public Child Welfare, 1(1), 3–34.

8. Faller, K., Masternak, M., Grinnell-Davis, C., Grabarak, M., Seffert, J., & Bernatovicz, F. (2009). Realistic job previews in child welfare: state of innovation and practice.  *Child Welfare, 88*(5), 23-47.

9. Flower, C., McDonald, J., and Sumski, M. (2005). Review of turnover in Milwaukee County private agency child welfare ongoing case management staff.

10. Folaron, G. & Hostetter, C. (2007). Is social work the best educational degree for child welfare practitioners? *Journal of Public Child Welfare, 1*(1), 65-83.

11. Glisson, C., & James, L. (2002). The cross-level effects of culture and climate in human service teams. *Journal of Organizational Behavior*, *23*(6), 767-794.

12. Institute for the Advancement of Social Work Research (2005). Factors influencing retention of child welfare staff: a systematic review of the research.  Available on line at http://www.socialworkpolicy.org/wp-content/uploads/2007/06/5-CW-SRR-FinalExecSummary.pdf

13. Jacquet, S., Clark, S., Moarze, J. & Withers, R. (Jan. 2008). The role of supervision n the retention of public child welfare workers. Journal of Public Child Welfare, 1(3), 27-54.

14. Kim, H., Wildeman, C., Jonson-Reid, M. & Drake, B. (2017). Lifetime prevalence of investigating child maltreatment among U.S. children. *AJPH Research 107*(2), 274-280.

15. Malm, Bess, Leos-Urbel, Geen, & Markowitz, 2001. *Running to keep in place: the continuing evolution of our nation's child welfare system*. Washington, DC: The Urban Institute.

16. Massachusetts Institute of Technology. Living wage calculator for S. Carolina. Available on line at http://livingwage.mit.edu/states/45

17. National Council on Crime and Delinquency (2006). *The human services workforce initiative: relationship between staff turnover, child welfare system functioning, and recurrent child abuse.* Houston, TX: Cornerstones for Kids.

18. Perry, R. & Dickinson, N. (2002). Factors influencing the retention of specially educated public child welfare workers. *Journal of Health and Social Policy, 15*(3/4), 89-103.

19. Potter, C. & Klein-Rothschild, K. (2002). Getting home on time: Predicting timely permanence for young children. *Child Welfare, 81*(2), 123-150.

20. Sage, M. (2013). *Child welfare workforce turnover: frontline workers' experiences with organizational culture and climate and implication for practice.* Portland, OR: Portland State University.

21. Steib, S., & Blome, W. (2004). Fatal error: The missing ingredient in child welfare reform— Part Two. *Child Welfare, 83*(1), 101–104.

22. Strolin, J. McCarthy, M. & Caringi, J. (2006). Causes and Effects of Child Welfare Workforce Turnover: Current State of Knowledge and Future Directions. *Journal of Public Child Welfare, 1*(2), 29-52.

23. U.S. Census. Quick Facts, S. Carolina (2017). Available on line at https://www.census.gov/quickfacts/sc

24. U.S. Department of Health and Human Services (2016). *Child maltreatment 2016*. Washington, DC: Author.

25. U.S. Department of Health and Human Services (2005). *General findings from the federal Child and Family Services Review*. Washington, DC: Author.

26. U.S. General Accounting Office (2003). *HHS could play and greater role in helping child welfare agencies recruit and retain staff.* Washington, DC: Author.

27. Williams, N, & Glisson, C., (2013). Reducing turnover is not enough: the need for proficient organizational cultures to support positive youth outcomes in child welfare. *Children and Youth Services Review*, retrieved on line April 17, 2015 at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3834965/

**Appendix A**

**Documents Reviewed for the Assessment**

- Michelle H. Settlement Agreement
- Michelle H. et al v. McMaster and Alford Monitoring Reports, I & II
- The SCDSS Case Practice Model
- Organizational charts
- 2015 Training Plan
- 2015-19 IVB Training Plan
- DSS and CSWE Training Competencies
- DSS workload analysis report, attachments, work group meeting minutes, and associated documents from Casey Family Programs
- Job Classifications and 2016 pay scales for CPS, Foster Care, IFCCS, Adoptions, and Family Preservation case managers and supervisors
- 2018 Insurance Summary
- 2017 Bonus Memo
- Summary of exit interviews January 2017-June 2018
- May 2018 Reviews Caseload Implementation Plan
- Workgroup charters for the DSS training, workload, and recruitment and retention workgroups
- Front line and supervisor turnover data for 2014 through quarter 1, 2018
- Workforce documents and websites from comparison states
- Job descriptions and workforce reports in selected states.
- SCDSS policy pertaining to salary raises in child welfare positions.
- SCDSS Employee Performance Management appraisal forms and policy.
- SCDSS Caseloads and Turnover PowerPoint presented at Senate hearing of 8/23/18.
- Caseload data reports
- Reports of caseloads assigned to supervisors
- Utilization records of transportation vendors
- Schedule of stipend payments to foster families

**Appendix B**

**Interview Questions**

**Interviews Questions for Local Office Directors**

**A. Interviewer explains:** purpose of interview, assurance of anonymity, voluntary nature of interview. Provide opportunity for interviewees' questions.

**B. Questions:**

1. Experience

2. County size: how many staff/units

      Assessment

      FP

      FC

3. Strengths/challenges with regard to workforce

- Degree of turnover and reasons

- Recruitment

- Hiring process/personnel selection

4. Describe the local office culture (morale, staff fear of liability, comfort with innovation, collegiality)

5. Describe the quality and sufficiency of training,

- Pre-service

- Ongoing

6. What role does performance appraisal play in guiding individual professional development planning for staff?

7. What are your views on the quality of supervision provided in your office? Why? What factors affect supervision either positively or negatively? Supervision: How often do you have regularly scheduled consultations with your staff?

8. Describe relationships with the community in your county

- Court

- Service providers

- Law enforcement

9. If you had the authority and resources necessary to make the most positive impact possible on the workforce in SCDSS, what three things would you do?

10. Is there anything I didn't ask you that you think I should know in my role as a consultant in workforce planning?

**Interview Questions for Supervisors**

**A. Interviewer explains:** purpose of interview, assurance of anonymity, voluntary nature of interview. Provide opportunity for interviewees' questions.

**B. Questions:**

1. Experience

2. What program(s) do you supervise?

3. How many staff do you supervise?

4. What are the approximate caseloads of your staff?

5. What strengths/challenges do you see with regard to workforce in DSS?

- Degree of turnover and reasons

- Recruitment

- Hiring process/personnel selection

6. How often do you have scheduled meetings with individual case managers in your unit?

7. Do you have group meetings with your unit and, if so, how often and for what purpose?

8. Describe the local office culture (morale, staff fear of liability, comfort with innovation, collegiality)

9. Describe the quality and sufficiency of training,

- Pre-service

- Ongoing

10. What are your views on the quality of supervision provided in your office? Why? What factors affect supervision either positively or negatively? Supervision: How often do you have regularly scheduled consultations with your staff?

11. Describe relationships with the community in your county

- Court

- Service providers

- Law enforcement

12. If you had the authority and resources necessary to make the most positive impact possible on the workforce in SCDSS, what three things would you do?


13. Is there anything I didn't ask you that you think I should know in my role as a consultant in workforce planning?

**Interview Questions for Case Managers**

**A. Interviewer explains:** purpose of interview, assurance of anonymity, voluntary nature of interview. Provide opportunity for interviewees' questions.

**B. Questions:**

1. Experience

2. In what program(s) do you work?

3. How many staff are in your unit?

4. What is your approximate caseload?

5. What strengths/challenges do you see with regard to workforce in DSS?

- Degree of turnover and reasons

- Hiring process/personnel selection (based on our experience)

6. Do you think you will be in your job two years from now? Why or why not?

7. How often do you have scheduled individual meetings with your supervisor?

8. Does your supervisor have group meetings with your unit? If so, how often and for what purpose?

9. Describe the local office culture (morale, staff fear of liability, comfort with innovation, collegiality)

10. Describe the culture in your unit?

11. Do you feel that your supervisor is competent? Why or why not?

Do you feel that your supervisor is supportive? Why or why not?

12. Describe the quality and sufficiency of training you have received,

- Pre-service

- Ongoing

13. Describe relationships with the community in your county

- Court

- Service providers

- Law enforcement

14. If you had the authority and resources necessary to make the most positive impact possible on the workforce in SCDSS, what three things would you do?

15. Is there anything I didn't ask you that you think I should know in my role as a consultant in workforce planning?

**Interview Questions for USC Training Personnel**

**A. Interviewer explains:** purpose of interview, assurance of anonymity, voluntary nature of interview. Provide opportunity for interviewees' questions.

**B. Questions:**

1. Describe your experience:


2. What role do you play in training?  Do you have any connection to Quality Assurance?


3. How do you connect with DSS?


4. Describe the planning and decision making processes you/USC engage in with DSS.


5. What is going well in the planning and delivery of training?


6. What are the challenges in the planning and delivery of training?


7. Is the capacity and staffing of the USC training program adequate for the need? If not, what is lacking?


8. Is a competency-based training approach used? If so, what are the competencies and how were they developed?


9. If you had the authority and resources, what three changes would you make to improve training, both pre-service and in-service?


10. Is there anything I didn't ask about that you think I should know?

**Interview Questions for Administrators/Managers in Central Office**

**A. Interviewer explains:** purpose of interview, assurance of anonymity, voluntary nature of interview. Provide opportunity for interviewees' questions.

**B. Questions:**

1. Describe your role. How long have you been in your job?

2. What experience did you have before taking your current job?

3. When you think about the workforce in SCDSS, especially at the front line, what positives do you see? What challenges?

4.  In what way are you positioned to influence the challenges you identify?

5.  If you have the resources and authority necessary to enact changes that would positively the workforce, what three things would you do?

6. If there anything I have not asked you about that you think I should know?

**Appendix C**

**Resources for Building the Child Welfare Workforce**

**This section contains links to the workload and workforce resources from nationally recognized organizations as listed below:**

1. PA.CFS 33.12, workload guidelines for public child welfare agencies from the Council on Accreditation. Available at **http://coanet.org/standard/pa-cfs/33/**

2. Caseload guidelines from the Child Welfare League of America, page 5 of Direct Service Workers' Recommendations for Child Welfare Financing and System Reform, 2012. Available at **https://www.cwla.org/wp-content/uploads/2014/05/DirectServiceWEB.pdf**

3. Wagner, D., Johnson, K., and Healy, T. (2009). Agency Workforce Estimation: Simple Steps for Improving Child Safety and Permanency. Children's Research Center, *Focus,* April 2009. Available at **https://ncwwi.org/files/Job_Analysis__Position_Requirements/Agency_workforce_estimation.pdf**

*4. Staying Power*, a toolkit for employee recruitment and selection in child welfare developed at the Jordan Center for Families at the University of North Carolina at Chapel Hill.  Available at **https://ncwwi.org/files/Recruitment_Screening_Selection/Selection_Toolkit.pdf**

5. The *Workforce Development Framework* from the National Child Welfare Workforce Center. Available at **http://ncwwi.org/files/Workforce_Development_Process/WDF_Final_June_2015.pdf**

6. Compendium of realistic job previews at the Child Welfare Information Gateway: **https://www.childwelfare.gov/learningcenter/video-series/rjp/**

7. South Carolina Teacher Salary Schedules: **https://ed.sc.gov/finance/financial-data/historical-data/teacher-salary-schedules/**

**Appendix D**
**Workforce Information from Selected States**

States referenced in this section are primarily those located in the South or Midwest as these were considered most comparable to S. Carolina in terms of their economies and employment markets. In addition, two northeastern states (Connecticut and New Jersey) are included because they have successfully met workforce and workload requirements associated with federal class action litigation.

<u>Connecticut</u>
Child welfare staff turnover in Connecticut ranges from 10 percent to 15 percent, but is usually from 10 percent to 12 percent. Leaders attribute this level of staff stability to the following:

- As a unionized state, salaries and raises in CT are negotiated. Agreements are re-negotiated every 2 and ½ to 4 years. Based on the current agreement, CW staff classification and award of salary increases is based on education and experience.
    - o Trainee – Trainees are hired at base pay, receive one raise at four months, and another at one year$51,188 to start; $1500 raise at 4 months; .
    - o SW level (either Trainees at one year and successful completion of training or MSWs with experience who begin at Social Worker level)- Receive a variable cost of living increase each July and an increase based on their experience for up to nine  years. After nine years, employees received an annual lump sum payment which does not add to their salary.
- Hiring for child welfare positions is prioritized to BSWs and MSWs.
- The agency uses a "predictive hiring plan" which calls for hiring up to 25 social workers every other month in an effort to minimize vacancies and the time that they last and to meet and maintain the current number of allocated positions. This plan accommodates the 120 new social worker positions the department was authorized to hire as of January 2018.
- The agency worked with the National Staff Development and Training Association to develop its current pre-service and ongoing training curricula. Training relies heavily on simulations which use former clients to role play family members and attorneys to train court simulations. New employee training is divided into two tiers: Tier 1 consists of four to five weeks of classroom training with no case assignment; Tier 2 weaves limited case assignment with training and mentoring.
- In-service training consists of 30 hours per year.  Content is based heavily on continuous quality improvement findings and individual learning plans. A Learning Management System tracks staff learning.

**Contacts:**
1. Jodi Hill-Lilly, Training Director, JODI.HILL-LILLY@ct.gov
2. Jeanette Perez, Human Resources Director, JEANETTE.PEREZ@ct.gov


## Georgia

Georgia Division of Family and Children's Services has reduced turnover from about 37 percent to 19 percent and is on track to achieve further reduction. This is attributed to

- Awarding of a 19% raise for frontline staff.
- Implementation of a practice model grounded in Solution Based Casework.
- Institution of a supervisor mentoring program that uses 23 mentors to support new supervisors across the state.
- Creation of practice model coaches with advanced training and support.
- Institution of a three level Social Service Specialist series for caseworkers.
- Development of competency-based training provided through the agency's caseworker academy.
- Implementation of the research-based employee selection protocol developed at the University of Georgia School of Social Work. This protocol includes a video realistic job preview, an applicant self-assessment, and a structured interview process.

Qualifications and starting salaries for caseworker positions are as follows:

- *Social Service Specialist 1*
  $35,387.99
  A baccalaureate degree from an accredited college or university
- *Social Service Specialist 2*
  $38,926.79
  Masters degree in any behavioral science or a BSW with one year experience as a Social Service Specialist 1 or position equivalent.
- *Social Service Specialist 3*
  $42,819.47
  Master's in Social Work or BSW and one year of experience as a Social Service Specialist 2

**Contacts in Georgia:**
1. Lee Biggar, MSW, Assistant Division Director, Knowledge Management, Georgia Division of Family and Children's Services, lee.biggar@dhs.ga.gov
2. Denise Edwards, Georgia Division of Family and Children's Services, Lead for agency-university consortium, l.denise.edwards@dhs.ga.gov


## Iowa

Iowa Department of Human Services maintains a turnover rate averaging between 8 and 9 percent for ongoing child welfare caseworkers and between 4 and 5 per cent for those conducting

assessments. Iowa attributes this degree of staff stability primarily to the competitive rate of compensation provided for child welfare staff. The current annual salary range for Iowa Social Worker 2s who are front line case managers in ongoing services ranges from $42,702.40 to $63,502.40. For Social Worker 3s who perform child abuse and neglect assessments, the annual salary range is $46,217.60 to $69,721.60. Both classifications are eligible for premium overtime which is at the one and one-half time rate for hours worked in excess of 40 per week.

### Louisiana

Overall turnover has dropped from 23.8 percent to 16.5 percent over the past year. Of the state's nine regions, one of the largest had a turnover rate of over 50 percent two years ago and is now at less than 30 percent. They attribute this to

- Adoption of the *Staying Power* selection and hiring protocol;
- Granting of two raises (one of 3-4 percent depending on salary and another of 2 percent) over the past year;
- Adding another promotional level to the Child Welfare Specialist job series (i.e., caseworker position in all child welfare programs) so that it now consists of Child Welfare Trainee, Child Welfare Specialist 1, CWS 2, and CWS 3 with automatic promotions for those with satisfactory job performance;
- Expanding the federal Title IV-E supported Child Welfare Scholars Program to all seven public university social work programs in the state. This program funds stipends, course work, and agency-based internships for up to 35 senior BSW students per year.
- Provision of monetary incentives for agency supervisors to supervise student interns.
- Reinstatement of the agency's MSW program for employees. This provides up to 240 hours of educational leave and covers tuition and books. The agency is working toward restoring the full time educational leave and 75 per cent of salary provision for MSW students that it offered a number of years ago.
- Provision of funding for payment of clinical supervision for MSWs wishing to obtain the Licensed Clinical Social Worker credential.
- Full implementation of a training academy for supervisors. This provides 2 days of classroom training per month for one year beginning with assignment to a supervisory position with the second 6 months focused on using CQI findings to identify and address practice needs, and three years of individual mentoring by paid mentors who are drawn primarily from retired former supervisors and managers.

The entry salary range for the Trainee/Child Welfare Specialist 1-3 series is from $29,733 to $42,380 per year and the maximum is $57,180.

The salary range for Child Welfare Supervisors is $46,6880 to $91,896 per year.  Need to add information about promotions, raises.

**Contacts:**

1. University IV-E partnership lead: Ruth T. Weinzettle, Ph.D., LCSW, weinzettler@nsula.edu

---

2. Department of Children and Family Services, Training Director: Jan Byland, JD, MSW, jan.byland.dcfs@LA.GOV

**New Jersey**
New Jersey Department of Children and Families has for several years maintained a turnover rate of less than 10 percent. Currently, the majority of its turnover in frontline positions is accounted for by agency promotions. Its leadership attributes this staff stability to:

- Salary increases. Staff enter as trainees, become Family Services Specialists in one year with a promotion, and can then promote to Family Services Specialist I.
- A strong relationship with university schools of social work that recruits BSW students and provides support for MSW education.
- A strong family centered practice model that is embedded at all levels of the agency
- Keeping caseloads down by maintaining a constant pool of prepared employees. Applicants are categorized into three tiers, A, B, and C with the "A list" comprising only BSWs or MSWs. Currently, the agency is almost always able to fill vacancies from this list.
- Training units in all offices.

**Contact:**
Suzanne Alvino, Administrator, Office of Training and Development, New Jersey Department of Children and Families, Suzanne.Alvino@dcf.nj.gov

**Oklahoma**
The Oklahoma Department of Human Services (OKDHS) is working under a federal court settlement agreement to reduce caseloads and turnover. Current turnover rates were not available. However, the agency has enacted two salary increases in the past 3 years and, anecdotally, finds that turnover is down in most areas of the state. The agency recently received a federal workforce grant and is focusing on the identification of reasons for staff turnover.

OKDHS has a three-step career ladder for front-line staff in child welfare. Positions include Child Welfare Specialist I, II, and III. The CWS I requires only a college degree in any subject and no experience. Level two requires one year of experience at level one and level three one year at level II so that an employee with a positive performance rating can progress to level III within two years. Currently salaries in these classifications are as follows:

Child Welfare Specialist I: $36,669.36
Child Welfare Specialist II: $40,624.92
Child Welfare Specialist III: $48,484.92
Child Welfare Specialist IV is the supervisory level and has a starting salary of $55,245.60
Staff with BSWs are started at salaries 5% above the base level and those with MSWs at 10% above.

**Contact:**
Stacy Pederson, Director of Human Resources, OKDHS, stacy.pederson@okdhs.org

**Texas**

The Texas Department of Family and Protective Services (DFPS) decreased its turnover by 27.5 percent in just one year through the following measures:

- Changes in leadership
- New caseworker training and mentorship
- Stipends to caseworker mentors
- Lowered caseloads
- Higher salaries (Raises of $1,000 per month)
- Enhanced promotion practices including a structure that allows MSWs to go to $57,000 within three to four years.
- Additional staff (800 new positions)
- Increased emphasis on organizational culture
- Increased focus on staff recognition
- Adoption of new caseworker safety protocols and technology
- Use of a screening tool for supervisor selection

Salaries for caseworkers in Texas DFPS now range from $45,800 to $49,134 per year with an additional $416 per month stipend for child protection investigation caseworkers.

Caseworkers who mentor are given a stipend of $300 per month when mentoring. They are assigned for three months at a time.

See https://www.casey.org/texas-turnover-reduction/ for further details.

Note: Even with the huge drop in turnover, turnover overall remains significant at above 20%. However, DFPS is tracking turnover closely, striving to make a positive work culture a priority, and working toward moving from merit raises every two or three years to every year.

**Contact:** Kristene Blackstone, Associate Commissioner, Texas Department of Familiy and Protective Services, Kristene.Blackstone@dfps.state.tx.us>